**S.H., a minor, by her guardian ad litem Chantal Holt, William Kenneth Holt and Chantal Holt, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV. S–11–1963 LKK DAD.**

United States District Court, E.D. California.

Signed July 7, 2014.

Filed July 8, 2014.

Erin Regina Steffin, Law Office of Erin Steffin, Scottsdale, AZ, Jeanne Anne Steffin, Law Office of Jeanne Anne Steffin, Alhambra, CA, Martin M. Berman, Martin M. Berman, A Law Corporation, Palm Springs, CA, for Plaintiffs.

Gregory T. Broderick, United States Attorney's Office, Sacramento, CA, for Defendant.

## AMENDED ORDER

LAWRENCE K. KARLTON, Senior District Judge.

The following is the court's opinion and order after trial.

In this case the plaintiffs allege medical malpractice on the part of United States

Air Force medical personnel. (Amended) Pretrial Conference Order (Final), Undisputed Facts ("Facts") (ECF No. 82) ¶ 1. Jurisdiction is predicated upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.

Plaintiff SH is a minor child who suffers from cerebral palsy. Facts ¶¶ 33–35. Plaintiffs' claim is that United States Air Force medical personnel committed malpractice during their treatment of plaintiff Chantal Holt—SH's mother—at Edwards Air Force Base in California (U.S.A.).

Specifically, plaintiffs assert that even though Air Force medical personnel provided care for, or were aware of Chantal's two premature deliveries, and one miscarriage, they (1) failed to warn Chantal about the added dangers she faced during her then-current pregnancy with SH, (2) failed to prepare her for those dangers, and (3) failed to caution her against traveling overseas to a facility that was not equipped to handle those dangers. Plaintiffs further assert that this malpractice was the proximate cause of SH's premature birth and resulting cerebral palsy.

The government's principal defense is that even if plaintiffs were the victims of malpractice by Air Force medical personnel in the U.S., their injury occurred in Spain—where SH was born—and therefore the case falls within the "foreign claim" exception to the FTCA, 28 U.S.C. § 2680(k), depriving this court of jurisdiction. Alternatively, the government argues that Mr. Holt's claim for emotional distress is barred by the *Feres* doctrine (*Feres v. U.S.,* 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950)). The government also asserts that its medical personnel did not commit malpractice against plaintiffs, and that there was no causation or damages for which it is liable.

For the reasons set forth below, the court finds that the foreign claim exception

does not apply here, and that plaintiffs have proven their case on the merits. Accordingly, judgment will be entered in plaintiffs' favor.

## I. JURISDICTION—THE FEDERAL TORT CLAIMS ACT

### A. The Law

Because the government's principal defense is jurisdictional, the court addresses it first. The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 & 2671–80, *inter alia,* grants exclusive jurisdiction to the federal district courts, for civil actions asserting:

> claims against the United States, for money damages ... for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). By its terms the FTCA also makes a sweeping waiver of the government's sovereign immunity in such cases. 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances"); *U.S. v. Yellow Cab Co.,* 340 U.S. 543, 547, 71 S.Ct. 399, 95 L.Ed. 523 (1951) (the FTCA "waives the Government's immunity from suit in sweeping language"); *Millbrook v. U.S.,* 569 U.S. ——, 133 S.Ct. 1441, 1442, 185 L.Ed.2d 531 (2013) (FTCA "waives the Government's sovereign immunity from tort suits").

However, the waiver of sovereign immunity is not all-encompassing. The FTCA's waiver does not apply to "[a]ny

claim arising in a foreign country." 28 U.S.C.A. § 2680(k); *U.S. v. Spelar*, 338 U.S. 217, 218, 70 S.Ct. 10, 94 L.Ed. 3 (1949) ("The Federal Tort Claims Act is inapplicable by its terms to 'any claim arising in a foreign country'").

■ The purpose of this exemption is to ensure that the United States would not be subject to tort liability as determined by the law of a foreign country:

> [T]hough Congress was ready to lay aside a great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power.

*Spelar*, 338 U.S. at 221, 70 S.Ct. 10; *Nurse v. U.S.*, 226 F.3d 996, 1003 (9th Cir.2000) ("[t]he purpose of the exception is to ensure that the United States is not exposed to excessive liability under the laws of a foreign country over which it has no control").

In this Circuit, and even in the Supreme Court, the "foreign law" problem was avoided simply by applying the FTCA as it was written. Specifically, liability was determined by the law of the place where the negligent act or omission occurred. *See* 28 U.S.C. § 1346(b)(1) (granting federal jurisdiction in cases where the United States shall be liable "under circumstances where ... a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*") (emphasis added);[1] *Richards v. U.S.*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ("[i]n the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred").

Under this simple rule, an FTCA claim "arises" in the place where the negligent act or omission occurs—not necessarily in the place where the injury or damage occurs—and that is also the place whose law governs. *See Cominotto v. U.S.*, 802 F.2d 1127, 1129-30 (9th Cir.1986) ("[u]nder section 2680(k), a tort claim arises in the place where the negligent act or omission occurs, not necessarily at the site of the injury or the place where the negligence has its 'operative effect'");[2] *accord, Richards*, 369 U.S. at 10, 82 S.Ct. 585 (expressly rejecting the argument that "that Congress intended the words 'act or omission' to refer to the place where the negligence had its operative effect," and that therefore the law of that place should determine liability).

Under this simple rule, grounded in the language of the governing statute, when negligent or wrongful conduct occurs entirely in the United States, the foreign claim exception would not apply, since liability is governed by the law of the state where the negligence or wrongful conduct occurred, even if the damage or injury occurred in a foreign country. *See, e.g., Leaf v. United States*, 588 F.2d 733 (9th Cir.1978) (section 2680(k) does not exempt U.S. from liability for negligence in this country which was alleged to have caused airplane damage in Mexico).[3]

This rule had the advantage of guaranteeing that foreign law could never be

---

1. *Accord*, 28 U.S.C. § 2674 ("If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides ... for damages only punitive in nature, the United States shall be liable for actual or compensatory damages ...").

2. Abrogated by *Sosa v. Alvarez–Machain*, 542 U.S. 692, 702, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

3. Abrogated by *Sosa*.

applied to determine the liability of the United States under the FTCA, exactly Congress's concern in enacting the foreign claim exception. That is because the rule had two parts: first, the claim arises where the negligent act or omission occurred; and second, liability was also determined by the law of the place where the negligent act or omission occurred. Therefore, if the negligence occurred in the United States, no matter where the injury occurred, liability would be determined by local law within the United States, and the foreign claim exception would not apply. Similarly, if the negligence occurred outside the United States, even if the injury occurred within the United States, liability would be determined by foreign law, and the foreign claim exception would apply.

In *Sosa v. Alvarez–Machain,* 542 U.S. 692, 707, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), the Court again recognized that "[t]he application of foreign substantive law ... was ... what Congress intended to avoid by the foreign country exception." Nevertheless, *Sosa,* without overruling *Richards,* swept aside the rule—anchored in the statute and *Richards*—that an FTCA claim "arises" where the negligent act or omission occurs. In its place, *Sosa* declared that "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Sosa,* 542 U.S. at 711, 124 S.Ct. 2739.

However, *Sosa* did not change the rule that liability is determined by the place where the negligence occurred. It thus appears to have created the precise situation the Congress tried to avoid in enacting the FTCA. Specifically, if the injury is suffered in the United States, then the claim is not barred by the exception even if the negligence occurred entirely in a for-

eign country, and even though foreign law presumably would apply. Conversely, if the negligence occurred entirely in the United States, but the injury occurred in a foreign country, then even though U.S. law would determine liability, the claim is barred under *Sosa. Sosa* went on to expressly reject the argument that the exception should not apply in a situation where U.S. law would determine liability for domestic negligence resulting in injury in a foreign country. *Sosa,* 542 U.S. at 710–11, 124 S.Ct. 2739.

■ Because "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred," *Sosa,* 542 U.S. at 711, 124 S.Ct. 2739, this case will be barred if, as the government asserts, the complained-of injury occurred in Spain. As this court has previously determined, however, the burden of establishing that the injury occurred in Spain—and that the foreign claim exception therefore applies—lies with the government. *See* ECF No. 59 at 13–14 (order denying summary judgment). The court therefore turns to the evidence regarding that matter, namely, whether the government has established that plaintiffs' injuries occurred in Spain.

## B. Undisputed Jurisdictional Facts.

1. Plaintiff SH was born May 12, 2005, at Puerto Real Hospital in or around Cadiz, in Southern Spain. Facts ¶¶ 33 & 34.

2. Plaintiff SH was born at approximately 31 weeks gestation. Facts ¶ 98.

3. Plaintiff SH exhibited normal "Apgars" blood gasses at birth. Facts ¶ 99.

4. Plaintiff SH exhibited signs of prematurity, including difficulty eating and breathing. Facts ¶ 100.

5. Plaintiff SH had to be intubated while in the hospital. Facts ¶ 101.

6. Plaintiff SH was kept in the neonatal intensive care unit ("NICU") for seventeen days. Facts ¶ 102.

7. Plaintiff SH was released from Puerto Real Hospital on or about May 30th. Facts ¶ 105.

8. Plaintiff SH was evaluated at the Landstuhl Medical Center, in Germany, by Dr. L. Smith. Facts ¶ 110.

9. Plaintiff SH was evaluated by two other doctors in Spain. Facts ¶ 111.

10. Plaintiff SH underwent an Electroencephalogram (EEG) while in Spain due to concern about seizures. Facts ¶ 112.

11. While in Spain, Plaintiff SH was prescribed anti-seizure medication. Facts ¶ 113.

12. The MRI showed that Plaintiff SH had Periventricular Leukomalacia ("PVL"). Facts ¶ 114.[4]

13. Upon arriving back in the United States, Plaintiff SH was seen at the Medical University of South Carolina ("MUSC") in Charleston. Facts ¶ 122.[5]

14. SH had access to and received specialty care while in Charleston, South Carolina. Facts ¶ 115.

15. In late–2006, Plaintiff SH was found to have tetraplegia of all four extremities and other deficits. Facts ¶ 123.

16. Plaintiff SH was definitively diagnosed with cerebral palsy at the approximate age of 2 years old. Facts ¶ 116.

17. Cerebral Palsy is not a disease, but a grouping of non-progressive, non-contagious motor conditions that cause physical disability in human development. Facts ¶ 117.

18. Because of her cerebral palsy, Plaintiff SH is significantly disabled. Facts ¶ 118.

19. Plaintiff SH has undergone several surgeries as a result of her cerebral palsy. Facts ¶ 119.

20. Plaintiff SH will be disabled for life. Facts ¶ 120.

21. Plaintiff SH's premature birth is the cause of her cerebral palsy. Facts ¶ 121.

22. Plaintiff SH cannot walk without assistance. Facts ¶ 125.

23. Plaintiff SH has significant cognitive impairment. Facts ¶ 126.

24. Plaintiff SH has significant mobility impairment. Facts ¶ 127.

25. Plaintiff SH has significant vision impairment. Facts ¶ 128.

26. Plaintiff SH will not be able to have gainful employment. Facts ¶ 129.

### C. Evidence Regarding Jurisdictional Facts.

 The government argues that SH's injury occurred in Spain because (1) plaintiffs seek damages from " 'the day she [SH] was born,' " ECF No. 174 at 7, (2) plaintiffs' required administrative tort claim, filed while plaintiffs were still in Spain, establishes that they are seeking damages for injuries occurring in Spain, and (3) the evidence at trial shows that SH's injury occurred in Spain.

#### 1. Damages.

The government asserts that Ms. Holt testified that she was claiming damages for SH's injury " 'from the day she [SH] was born.' " ECF No. 174 at 7. In fact, Ms.

---

4. The MRI was done while plaintiffs were still in Spain. TR 240 (Ms. Holt testimony).

5. Plaintiffs were in Spain "through June 2006," and thereupon moved to South Carolina (U.S.A.). TR 252 (Ms. Holt testimony).

Holt withdrew that statement immediately upon uttering it, and instead testified that she did not know what period of time she was seeking damages for:

Q. Are you claiming damages for the time that you've had to spend taking care of [SH] in this case?

A. Yes, sir.

Q. Starting from when?

A. From the beginning.

Q. From the day she was born?

A. I would say so. Yes, sir.

Q. From the day she was born?

A. *I don't know. I honestly don't know.* I would have to see the thing [the Jeannie McNulty (economist) report]. I just—since I haven't seen it, I—

TR 114. Thus, Ms. Holt gave two different answers to the question the government quotes, namely, "[f]rom the day she was born?" Although she initially answers "Yes, sir," she then immediately withdrew her answer, by stating, in response to the same, repeated, question, "I don't know. I honestly don't know." In other words, Ms. Holt was confused, and did not know what the answer to the question was, notwithstanding her prior answer, which only reflected her confusion. The court accordingly rejects the government's assertion that Ms. Holt's testimony on this issue compels the conclusion that plaintiffs' injury and resulting damages occurred in Spain.

The government next asserts that plaintiffs' economic expert, Jennie McNulty, calculated damages from when SH was born, in Spain, and concludes that the injury and resulting damages therefore arose in Spain. ECF No. 174 at 7. The government is correct that this was the stated basis for the expert's damages calculation. However, the government does not explain why this supports its conclusion that the

calculation bars plaintiffs' entire claim. At most, the expert's testimony shows that plaintiffs are seeking damages beyond what they are entitled to. That is, since plaintiffs assert that the injury occurred in South Carolina, they will have some difficulty in explaining why their damages should be calculated from a time that precedes their presence in South Carolina. However, there is no basis for this court to conclude that even if plaintiffs are seeking more damages than they are entitled to, that they are therefore entitled to no damages whatever. The court accordingly rejects the government's assertion that McNulty's damages calculation establishes that plaintiffs' claim "arose in Spain and is barred by § 2680(k)." *See* ECF No. 174 at 7.

### 2. The Administrative Claim.

The government next asserts that plaintiffs' lawsuit is barred by the foreign claim exception because the administrative claim relating to this lawsuit was "signed and submitted" on or about June 9, 2006, while the plaintiffs were still living in Spain. ECF No. 174 at 8. The administrative claim sought money damages for, among other things, "catastrophic neurological injuries," "seizures," and "cerebral palsy." *See* Exh. 3T (admitted RT 262) at second (unnumbered) page. The claim requested $100 million in personal injury damages. *Id.*, at first page. That administrative claim is for the damage on which this case is now based. TR 664 (Ms. Holt testimony).

The government therefore argues that plaintiffs have submitted a claim for an injury arising in Spain, and is therefore barred by the foreign claim exception, a jurisdictional bar. It goes on to argue that if plaintiffs are seeking damages for a claim that arose in South Carolina, they failed to file an administrative claim for it, and therefore are jurisdictionally barred

by their failure to exhaust their administrative remedies.[6]

■ Plaintiffs do not agree that the claim form establishes that the injury occurred in Spain. Rather, they assert that the claim forms were prepared by plaintiffs' counsel in an attempt to preserve plaintiffs' rights, including making sure that they did not lose their claims to the statute of limitations. Since the presentation of an administrative claim is jurisdictional, it is plaintiffs' burden to establish that they met the administrative claim requirement of the FTCA. *See Cadwalder v. U.S.*, 45 F.3d 297, 300–01 (9th Cir.1995).

■ The FTCA waives the government's immunity for tort claims only if the plaintiff has first "presented" the claim to the appropriate federal agency and been turned down. 28 U.S.C. § 2675(a). This court is required to interpret the Section 2675(a) waiver of federal sovereign immunity "strictly."

> "[T]he administrative claim requirements of Section 2675(a) are jurisdictional in nature, and thus must be strictly adhered to. This is particularly so since the FTCA waives sovereign immunity. Any such waiver must be strictly construed in favor of the United States. Section 2675(a) establishes explicit prerequisites to the filing of suit against the Government in district court. It admits of no exceptions. Given the clarity of the statutory language, we cannot enlarge that consent to be sued which the Government, through Congress, has undertaken so carefully to limit."

*Cadwalder*, 45 F.3d at 300–01 (quoting *Jerves v. U.S.*, 966 F.2d 517, 521 (9th Cir.1992)).

It is undisputed that plaintiffs "presented" their FTCA claim to the Air Force in June 2006, while they were still living in Spain. First Amended Complaint (ECF No. 6) ¶ 4; Answer ¶ 4; RT 252 (Ms. Holt testimony; plaintiffs were in Spain "at least through June" of 2006). The government's argument is that this fact, standing alone, establishes that SH's injury occurred in Spain. However, the government cites no case for this proposition, and the court cannot agree with it.

■ The FTCA administrative claim is intended to enable the government to make its own investigation, and to alert it to a request for a sum certain in damages. *See Cadwalder*, 45 F.3d at 301. The Holts' administrative claim does just that in this case. It alerts the Air Force that plaintiffs were claiming negligence by Air Force medical personnel at Edwards Air Force base, by, generally speaking, failing to warn and prepare Ms. Holt for the dangers her fourth pregnancy presented, given her two prior premature births and one miscarriage. It further alerts the Air Force that this alleged negligence resulted in $100 million in damages to the plaintiffs as the direct and proximate result of the premature birth. It further alerts the Air Force of all the possible consequences of its alleged negligence, including "cerebral palsy," and the sum certain that plaintiffs were claiming.

The government seems to be arguing that the administrative claim form is an admission by plaintiffs that the injuries

---

**6.** The court notes that this argument, although jurisdictional, is an afterthought by the government. The government sought summary judgment in this case without ever raising this issue. It argued that the injury occurred in Spain, but did not identify these administrative claim forms as the basis for the argument until trial, even though the government has had the forms since June 2006. Nevertheless, since the issue goes to federal jurisdiction, the court will consider the argument, even at this late date.

identified in the form had already occurred in Spain, since the form was sworn to by plaintiffs, and was prepared with the assistance of counsel. At trial, counsel for the government pointed out to Ms. Holt that there could be a "civil penalty" attached to signing the form falsely. TR 263.

However, this form, Exhibit 3T, is not what the government says it is. Exhibit 3T is an administrative claim form. It does require the claimant to set forth the "basis of claim," in other words:

> state in detail the known facts and circumstances attending the . . . injury, . . . identifying persons . . . involved, the place of occurrence and the cause thereof.

Exh. 3T ¶ 8. It also requires the claimant to

> state the nature and extent of each injury . . . which forms the basis of the claim.

Exh. 3T ¶ 10.

Contrary to the clear implication of the government's assertion however, the certification portion of the document does not require the claimant to swear that every identified injury was known to exist at the time of signing. Rather, it states only:

> I certify that the amount of claim covers only damages and injuries caused by the incident above and agree to accept said amount in full satisfaction and final settlement of this claim.

Exh. 3T ¶ 13a. In other words, the Holts' signature signaled only their agreement to limit their damage claim to whatever was included on the claim form. Thus, even if cerebral palsy had not yet occurred, the parents had to include a claim for it, or they would be forever barred from seeking damages if or when it did occur, so long as it arose from the negligence identified in the form. Indeed, in this specific case, the parents—and their counsel who is the person who actually completed this form (TR 264)—must reasonably have believed that they were *required* to list cerebral palsy on the claim form, since one doctor had told them that in his view, SH already had cerebral palsy. Plaintiffs now assert that this information, from Dr. Shales, was erroneous, as discussed below, but they could hardly have been expected to ignore it when filling out their administrative claim form. Failure to list an injury that had already been identified by their doctor—even if he did so in error—would possibly have forever barred the plaintiffs from seeking damages for cerebral palsy after it actually did occur, so long as it arose from the negligence alleged in the claim form.

Moreover, even if the parents did *believe* that SH had cerebral palsy in Spain, and stated so on the claim form, that is not an "admission" that SH had cerebral palsy. Whether SH had cerebral palsy in Spain is a medical question which this court will resolve based upon the medical evidence adduced at trial, not based upon whatever belief (mistaken or not) the parents may have had at the time they signed the claim form.

Plaintiffs' form accordingly tells us nothing when it comes to the foreign claim exception. What it does tell us is that plaintiffs listed every injury that their lawyer conceived could possibly result from the negligence alleged in the form. It does not admit that those injuries have already occurred, nor does it admit that the injuries occurred in Spain. The claim form, and the plaintiffs' signature thereon, only serves to give the government notice of the alleged negligence, the possible injuries and the claimed monetary damages, so that the government can investigate, and that is all. Having fulfilled its statutory purpose, the administrative claim does not resurrect itself at trial to trap unwary

litigants into making admissions about where an injury occurred for purposes of the foreign claim exception.

The government's fallback position is that if the cerebral palsy occurred in South Carolina, then this lawsuit is barred because plaintiffs did not file a separate administrative claim to cover it. *See*, ECF No. 174 at 9. However, the government identifies no case or statute indicating that a new claim is required even when the claim for damages from cerebral palsy is in the claim that was presented, and the cerebral palsy arises from the same negligence that was already identified in the claim.

The court finds that the government was already put on notice that its medical personnel negligently treated Ms. Holt, that their negligence resulted in premature birth in a location not equipped to handle it, and that cerebral palsy and its resulting monetary damages, was among the possible injuries that could result from this negligence. No additional or subsequent administrative claim was required for this lawsuit to proceed.[7]

### 3. The evidence at trial.

The government asserts that the evidence at trial "conclusively establishes" that SH was injured in Spain. ECF No. 174 at 9. The government first points to the undisputed facts that SH "exhibited signs of prematurity, including difficulty

eating and breathing," "had to be intubated while in the hospital," "was kept in the neonatal intensive care unit for seventeen days," and was diagnosed with esotropia. *See* ECF No. 147 at 9–10; Facts ¶¶ 100–02. The government concludes, as to those facts, "[t]hese are injuries." ECF No. 147 at 10. They may well be injuries, but they are not the injuries that plaintiffs are suing over. Nothing in plaintiffs' administrative claim nor their Complaint alleges that those matters are injuries for which they seek compensation.[8] They need not be considered further.

The government next points to evidence that, it believes, shows that SH "suffered seizures or involuntary shaking of the leg," that the "seizures" were frequent and getting worse in Spain, that SH was placed on powerful anti-seizure medication while in Spain, and that "seizures are an injury." ECF No. 147 at 10. An examination of the evidence the government identifies for this proposition however, does not reveal evidence showing "conclusively" that SH had "seizures" in Spain.

The undisputed facts show that Ms. Holt noticed "shaking in Plaintiff SH's leg while still in Spain." Facts ¶ 109. This does not establish that there was any "involuntary" shaking, nor does it establish that the shaking was a "seizure." The government cites the testimony of Dr. Delgado, TR 606, for its assertion that the "seizures"

---

7. Plaintiffs allege in their complaint (ECF No. 6) and argue in their post-trial brief that medical personnel at Travis AFB and Landstuhl military base were negligent by failing to warn Ms. Holt of the dangers she faced in future pregnancies. However, the administrative claims they presented to the government alerts the government to alleged negligence only at Edwards AFB. *See* Exhibit 3T. Accordingly, any claims based upon negligence at Travis or Landstuhl are jurisdictionally barred.

8. Indeed, the uncontested testimony in this case is that "esotropia," which is "a problem with muscle control of the eyes," is "[v]ery common in preterm infants," and is seen "a lot in preterm babies who have *no evidence of injury*," and "no *neurologic deficit*." TR 70–71 (testimony of Dr. Null) (emphasis added). Moreover, Mr. Holt also has this condition, and the Holts apparently do not view it as an injury or anything to sue over. *See* TR 256 (Ms. Holt testimony: "My husband had it [esotropia], too"); 424 (Mr. Holt testimony: "I have it [esotropia]").

were frequent and getting worse. ECF No. 147 at 10. However, Dr. Delgado's cited testimony does not refer to any "seizures." Rather, he states that Ms. Holt reported "unusual movements" in SH's legs. TR 604. In response, Dr. Delgado told Ms. Holt that the movements "had the *potential* to be *consistent* with a seizure, and that the information she would provide me would help me figure that out." TR 605 (emphases added). Dr. Delgado further testified that he ordered "standard studies to look for seizure activity, an EEG, a brain MRI, and consultation with a pediatric neurologist," and that he "did prescribe something called phenobarbital, which is an anti-seizure medication." TR 605. In other words, Dr. Delgado thought that the leg movements reported by Ms. Holt could possibly be seizures, and that the proper course was to take tests to make a determination, and in the meantime, to prescribe phenobarbital.[9]

The government goes on to argue that "the Holts knew that something was 'wrong' with S.H." while they were still in Spain. ECF No. 174 at 10, citing TR at 662:15–18.[10] The government's argument implies that the Holts themselves testified that they knew that something was "wrong" with SH while they were still in Spain. Yet, the cited testimony does not

state that. To the contrary, when Ms. Holt was asked when she got "an indication that something might be wrong with Sarah," she testified, "I brought up a, like, a shaking in her leg, and *I just wasn't sure.*" TR 662:15–18. Thus, Ms. Holt's testimony is that she "wasn't sure" if something might be wrong with SH, not that "she *knew* that something was wrong." *See* ECF No. 147 at 10 (emphasis added).

■ Moreover, even though the government asserts that "the Holts knew" that something was wrong with Sarah while they were still in Spain, it fails to direct the court's attention to Mr. Holt's testimony on this point, even though "the Holts" refers to both parents. In fact, when asked, "Isn't it true that you knew something was wrong with her [SH] even if you weren't sure quite what it was," Mr. Holt answered:

> *No.* Again, you're—I think you're implying that we knew at that point that there was a life-long condition. *No. The answer is no.*

*TR 424:*25 to 425:4 (emphases added).[11] "The Holts" did not testify that they knew that something was wrong with SH while they were still in Spain.

---

9. Dr. Paul Shales, meanwhile, when asked if he told the Holts that SH "had neonatal seizure disorder *that was probably resolved,*" testified, "I did." TR 793–94 (emphasis added). The government also neglects to mention that SH was "completely weaned off of phenobarbital" by June 2006, while plaintiffs were still in Spain. *See* Exh. X at US_002057 ¶ 7.

10. The government cites "TR. *62* 2:11–14," which appears to be a typographical error for "TR. *66* 2:15–18." There is no testimony from the Holts on page 622 of the trial transcript.

11. Counsel has a duty of candor to the court. *See, e.g., Campbell v. Rice,* 408 F.3d 1166,

1175 (9th Cir.) ("A prosecutor, like all attorneys, also owes a duty of candor toward a court"), *cert. denied,* 546 U.S. 1036, 126 S.Ct. 735, 163 L.Ed.2d 578 (2005). The court believes that that duty is not well served by placing a word in quotation marks and attributing it to a witness who did not actually utter it, and who did not adopt the word in her answer to the question where the word was used. In addition, the court believes that counsel should not attribute a quotation to two persons, while citing only to the testimony of one of those persons, especially when the testimony of the second person directly contradicts counsel's assertion.

1124

The government next identifies a purported admission by the Holts that "S.H. had developmental delays in Spain, *which they listed as 'severe'* when they enrolled her in the Air Force's special needs program, still in Spain." ECF No. 147 at 10 (emphasis added), citing Exhibit 2V and TR 540:1–22. In fact, Exhibit 2V contains no such admission by the Holts. Mr. Holt's signature on the form is only to identify him as the "sponsor" who is authorizing "the release of information" about SH "to personnel of the Military Departments." Exh. 2V at US_002548 ¶ 1(a)-(d). Elsewhere on the form is an assertion that SH is eligible for the program because she has "developmental delay" described as "severe." *Id.,* ¶ 4(b) & 5. However, that assertion is made by Leslie Fox, an "Early Intervention Specialist," and signed by Fox, not by Mr. or Ms. Holt. *Id.,* ¶ 6(a) ("name of individual completing this section"), (b) & (i). It is simply false to assert that this is an admission by the Holts.[12] The government's reference to Mr. Holt's testimony at TR 504:1–22 adds nothing, because it is simply Mr. Holt describing the form and the entries thereon which, as pointed out, were completed by Ms. Fox and contain her assertions, not his. *See* TR 504:1–22.

The government next asserts that the Holts "knew that an MRI in Spain showed that S.H. had periventricular leukomalacia or 'PVL' ... which Plaintiffs' expert Dr. Null testified was 'evidence of some injury to the white matter' of the brain." ECF No. 174 at 10, citing Facts ¶ 114 and TR 73:3–6. It is uncontested that SH had an MRI while the Holts were still in Spain. The government is correct that, according to the undisputed facts, the MRI, taken in Spain, "showed that Plaintiff SH had Periventricular Leukomalacia ('PVL'). Facts ¶ 114.[13] However, besides defining what PVL means, the government never establishes that this is an injury that plaintiffs are suing over in this case. To the contrary, the uncontested testimony of plaintiffs' expert, Dr. David Griesemer, when asked whether the PVL report was "significant evidence of some sort of problem that the child is going to have or presently has," answered:

*No.* I think everyone was very cautious not to equate this finding with something that would be necessarily problematic later. I think the best we get out of anyone, whether it's the radiologist or the neurologist, is this is something that needs to be followed up, we need to look at it later. *It is clearly not a clear prediction of her later diagnosis of cerebral palsy.*

TR 316–17 (emphases added).

The government next asserts that SH had "abnormal physical limitations," and a "litany of 'medical problems,'" requiring her to see "'lots and lots of doctors,'" while still in Spain. ECF No. 147 at 10, citing Mr. Holt's testimony at TR 424:4–14 and 425:23–426:4. Once again, the cited testimony does not say what the government claims. First, Mr. Holt did not testify that SH had a "litany" of medical problems, rather he answered "Sure," when asked whether SH "had at least medical problems in Spain." TR 425:23–426:1. He

---

12. It is additionally false for the government to assert that "they" made this admission, since Ms. Holt's name and signature are nowhere on this form, and there is no reference to her at all.

13. This concession by plaintiffs is surprising however, since their own expert testified that

"everyone was sort of hedging around" the question of whether Sarah had a diagnosis of PVL, and that while "the findings are consistent with [PVL], ... it's not clearly asserted.... And this was pretty mild and iffy." TR 316.

did testify that SH saw "lots and lots of doctors" in Spain. TR 426:2–4. However, the plaintiffs are not suing under the FTCA because SH had unspecified "medical problems" or because she saw lots and lots of doctors; they are suing over the *catastrophic* medical problems they say arose after they returned to the United States, and the life-long medical and other care they claim she will require.

Second, Mr. Holt's cited testimony at 424:4–14 does not assert that SH had "abnormal physical limitations," and in fact, he specifically denies that:

Q. Isn't it true that you understood that she had physical limitations while you were in Spain?

THE COURT: You mean physical limitations different than a child, a newborn child?

MR. BRODERICK: Yes, sir.

THE COURT: Did you know that?

THE WITNESS: I think so. Again, Your Honor, we didn't know exactly what was going on. Not that we didn't even know exactly what was going on, but nobody really could tell us specifically, or, you know, *they couldn't tell us whether she had developmental and physical delays that were consistent with a child that was, you know, two months premature, or were they consistent with a child with an actual problem.*

Did she have developmental delays? Yes, that's fair. But I mean, again, she

had episodes, and she was on phenobarbital, and that could be part of that. I mean, we just—nobody knew what was going on.

TR 424 (testimony of Mr. Holt).

The government next asserts that "the Holts testified" that "they knew that S.H. was 'not developing like her other two siblings had,' even though the other siblings were also premature." ECF No. 147 at 10, citing TR 774:19–21.[14] Once again, the cited evidence is not quite as the government describes it. First, the cited testimony is from Dr. Shales, not "the Holts." Second, the Holts were never called to testify as doctors nor as expert witnesses on child development. Accordingly, their apparent concern about SH's development, as reported to Dr. Shales, does not move the case forward at all on whether SH had cerebral palsy while still in Spain.[15]

The government next relies on SH's referral to "Early Development Intervention Services," and the conclusions contained in Exhibit D, an "Early Intervention Developmental Evaluation." ECF No. 147 at 10. The government asserts that SH was referred for these services based on her "manifest problems in Spain." *Id.* The cited testimony however, establishes that Dr. Delgado referred SH for those services, but it does not establish what problems were the basis for the referral. *See* TR 607:10–12. The court does not know what the government is referring to when it refers to "manifest problems." Howev-

14. The government cites "Tr. at 775:17–23," which appears to be a typographical error.

15. Indeed, the government's repeated reliance on observations and admissions of the Holts makes for a very unconvincing case on this issue. As the government itself asserts, the question on the foreign claim exception is where the claim *occurred*. Yet, the government repeatedly relies on observations or concerns from the parents, even though it has

offered no basis for the court to conclude that the Holts could possibly make the *medical* determination of when or where the injury occurred. The court notes that Ms. Holt is currently enrolled in school, aiming to get into pharmacy school. TR 82 (Ms. Holt testimony). There is no evidence that she is a doctor. Mr. Holt is in "aircraft maintenance." TR 386 (Mr. Holt testimony). There is no evidence that he is a doctor.

er, Dr. Delgado's testimony immediately prior to his referral testimony concerned Ms. Holt's concerns about SH's leg shaking, eye movements, and whether SH was achieving development milestones according to the "standard timeline based upon her age." None of these things identify "injuries" that plaintiffs are suing over. The leg shaking and eye movement issue ("esotropia") are discussed above. There is nothing in the cited testimony, or the testimony leading up to it, that establishes that at the time of the referral, SH had developmental deficits, as opposed to temporary developmental delays common to premature infants. Ms. Holt's reported concerns and observations about SH's development do not establish that SH had "learning deficits" or any of the other injuries plaintiffs are suing over.

The government, quoting Exhibit D, asserts that the Holts knew that SH had "'motor skills that were significantly delayed when compared with other children of her own age,' even correcting for S.H.'s prematurity," because this evaluation was read aloud to them.[16] ECF No. 147 at 10.[17] However, nothing in the evaluation states or implies that SH's significantly delayed motor skills are, or will lead to, the catastrophic, life-long motor deficits that plaintiffs are suing over. Rather, the cited evaluation was done 7 months after SH was born, at a time when her evaluation age—adjusted for her prematurity—was just 5 months. *See* Exh. D at US_001905 ("Chronological Age: 7 months," "Adjust-

ed Age: 5 months"). To the contrary, the cited evaluation, while establishing that SH qualified for "Early Intervention services" because of her "delays in the areas of motor and problem-solving skills," never states that SH is permanently or catastrophically injured in regard to her motor skills. Rather, it establishes that at the early stage SH was evaluated, she was "*at risk* for developing motor problems including cerebral palsy." *Id.*, at US_001910 (emphasis added).

The government next cites Exhibit X for the proposition that the Holts knew that SH "required and received physical therapy, speech therapy (for feeding), and occupational therapy, all while in Spain," and that plaintiffs went to Germany to get a pediatric neurological evaluation for SH. ECF No. 147 at 10. Aside from the "occupational therapy," the government's assertion appears to be correct.[18] However, it does not establish that SH had any of the injuries the plaintiffs are suing over now. The government has offered no evidence to show that a child who receives physical and speech therapy at 13 months necessarily has cerebral palsy, or some other catastrophic and permanent injury. The government is also correct that the evidence shows that plaintiffs went for a pediatric neurologic exam in Germany while they were still living in Spain. However, going for an exam is not itself evidence of the permanent and catastrophic injuries that plaintiffs are suing over now. As dis-

---

**16.** The court notes the government's emphasis in this section of its brief to what the Holts knew and when they knew it. As the government itself argues, this issue goes to whether the statute of limitations should be tolled, which is not in issue here. The court will consider the government's arguments here to be asserting what conditions SH had, not simply what conditions her parents knew about.

**17.** *See also*, Exh. D at US_001910 ("[a]ll testing took into consideration S.H.'s adjusted age for prematurity").

**18.** As for "occupational therapy," Exh. D indicates that there was an "evaluation/assessment," but it offers no explanation of what that could mean for such a young child. In any event, it does not state that SH, then a 13–month old child, "received" occupational therapy. *See* Exh. D at US_002060 ¶ 13.

cussed above, the evidence does show that SH was "at risk" for such injuries, but at this point, while plaintiffs were still living in Spain, the evidence thus far does not tend to show that those injuries had yet occurred.

The government next cites Dr. Delgado for the proposition that plaintiffs "returned to the U.S. some two years early due to S.H.'s manifesting problems, for which S.H. would need specialized care not available to her in Spain." ECF No. 147 at 10, citing TR 622:5–19. The cited testimony, by Dr. Delgado, was that:

> Over the course of my interactions with the family and with the other pediatric specialists on the base, the conclusion was that Sarah would eventually need services that we couldn't offer there. And so we had to take active measures to provide the family with paperwork that they would submit that would trigger an early return.

TR 622:13–18. This testimony is consistent with the evidence, discussed above, that SH's parents and doctors were concerned that she was "at risk" for serious injuries, including cerebral palsy, and that there was a possibility that other serious injuries could eventually develop. The evidence, including Dr. Delgado's account, thus leads to the reasonable inference that the parents decided to transfer to a place that would be prepared to deal with these eventualities if they did occur. There is no reasonable inference from this evidence that those injuries had already occurred at the time the parents decided to leave Spain.

The government next asserts that plaintiffs' own evidence shows that SH received a "brain injury" at birth, and in any event no later than one year after birth, and therefore the injury occurred in Spain. ECF No. 147 at 11. The government is correct that the uncontested evidence allows the court to conclude that SH received a brain injury at birth, and that this was the injury that resulted in her cerebral palsy. *See* TR 69–70 (Dr. Null testimony: SH's cerebral palsy resulted from an injury or insult to her brain that probably occurred at birth, or within six months of birth). Indeed, it is undisputed that "Plaintiff SH's premature birth is the cause of her cerebral palsy." Facts ¶ 121.

The government's argument that this requires application of the foreign claim exception is predicated however, on its misrepresentation of the holding of the principal Supreme Court case governing this issue, *Sosa*. According to the government, the Supreme Court "explained" in *Sosa* that "a claim arises in 'the jurisdiction in which injury was *received*. *Sosa*, 542 U.S. at 705, 124 S.Ct. 2739 (emphasis added).'" ECF No. 147 at 11. However, the Supreme Court "explained" no such thing. Rather, in reaching its actual holding, the Court surveyed what other courts, academics and treatises had to say, and in the course of so doing, quoted a 1962 article published in the Florida Law Review:

> A commentator noted in 1962 that, for the purposes of these borrowing statutes, "[t]he courts unanimously hold that a cause of action sounding in tort arises in the jurisdiction where the last act necessary to establish liability occurred"; i.e., *"the jurisdiction in which injury was received."* Ester, "Borrowing Statutes of Limitation and Conflict of Laws," 15 U. Fla. L.Rev. 33, 47. *Sosa*, 542 U.S. at 705, 124 S.Ct. 2739 (emphasis added). The government's assertion that the court must look to where the injury was "received," is supported only by the author of the quoted law review article, not by the Supreme Court in *Sosa*.

Moreover, the Supreme Court in *Sosa* did not simply adopt the law review's language. Rather, the Court continued its survey of other ways to describe where the claim arose, referring to the following: "where [the] cause of action *arose, or accrued, or originated*," "courts generally applied the law of the place *where the injury occurred*," "[the conflicts of laws rule] is to apply the law of *the place of injury* to the substantive rights of the parties," "defendant's liability determined by 'the law of the place of wrong,'" and "'the place *where the harmful force takes effect* upon the body.'" *Sosa*, 542 U.S. at 705–06, 124 S.Ct. 2739 (some emphases added) (quoting *Richards*, 369 U.S. at 11–12, 82 S.Ct. 585, American Law Reports and the Restatement (First) of Conflict of Laws).

By focusing on where the injury is "received," the government essentially excludes plaintiff's theory that the court should look to where the injury first "manifested" itself. That is because the place where the injury was "received" is also "the jurisdiction where the last act necessary to establish liability occurred," according to the law review article, namely, the premature birth.

Ultimately, *Sosa* held that "the FTCA's foreign country exception bars all claims based on *any injury suffered* in a foreign country." The question then, is whether the injury plaintiffs are suing over was "suffered" in Spain or in the United States. The government has failed to show that they were suffered in Spain, because the brain injury the government refers to is not the injury plaintiffs are suing over. As discussed above, the pre-

mature birth and resulting brain injury would not necessarily lead to the cerebral palsy and catastrophic neurological injuries plaintiffs are suing over. The uncontested evidence is that those events may be the cause of the eye issue, and early developmental delay, neither of which plaintiffs are suing over.

The question of where SH suffered the injury plaintiffs are suing over is determined by federal law, as the government asserts, because it goes to the applicability of an FTCA exception. The problem is that neither side has directed the court to any case describing where the injury is suffered for purposes of the foreign claim exception, other than *Sosa*. While *Sosa* provides the guiding principle involved here—the claim arises where the injury is suffered—it does not tell us where the injury was suffered in this case. In *Sosa*, the injury plaintiff was suing over—false arrest—plainly occurred in Mexico. *See Sosa*, 542 U.S. at 698, 124 S.Ct. 2739 (Sosa sued under the FTCA "alleging false arrest," and plaintiff's arrest "was said to be 'false,' and thus tortious, only because, and only to the extent that, it took place and endured in Mexico").[19]

█ Accordingly, this court, following the Supreme Court's lead in *Sosa*, looks to cases addressing statutes of limitations to determine when and where the injury occurred. "[I]t is 'the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action.'" *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007).

"Under the traditional rule of accrual ... the tort cause of action accrues, and the statute of limitations commences to

**19.** The location of the injury was not at issue in *Sosa,* since the false arrest (or kidnapping) took place in Mexico, and that false arrest was what the plaintiff was suing over. The issue in *Sosa* was whether the location of the

negligent or wrongful act governed where the claim "arose" for purposes of the foreign claim exception. The Court held that the claim "arose" not where the negligence occurred, but where the injury occurred.

run, when the wrongful act or omission *results in damages.* The cause of action accrues even though the full extent of the injury is not then known or predictable." 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526–527 (1991) (footnote omitted). *Wallace,* 549 U.S. at 391, 127 S.Ct. 1091.[20] Although the applicability of the foreign claim exception is determined by federal law, one aspect of it is dependent upon the law of the place where the negligence occurred, namely California. Specifically, in asking where the "injury" happened, we must look to the law of California to determine what is an injury. That is because the law of California governs liability and therefore determines where the injury sued on occurred in the first place. *See* 28 U.S.C. § 1346(b).

■ Under California law, "injury" is defined "as the point at which appreciable harm [from the negligence] was first manifested. To be 'manifested,' the damage from the negligence must ha[ve] made itself known in some outward fashion." *Katz v. Children's Hosp. of Orange County,* 28 F.3d 1520, 1526·(9th Cir.1994) (citations and some internal quotation marks omitted). Accordingly, applying federal law, we know that the foreign exception applies where the "injury" occurred. But, applying California law, we know that the "injury" occurs where it first "manifests" itself.

The government argues that the injuries sued over were manifest in Spain, citing "seizures," white matter brain damage, "severe" developmental delay, and esotropia. However, as discussed above, the government has not shown the presence in Spain of the catastrophic neurological damage or cerebral palsy that plaintiffs

are suing over. The government has not shown the existence of "seizures." Rather, it has shown only that Ms. Holt reported leg shaking, which plaintiffs are not suing over. Although SH was prescribed phenobarbital, which can control seizures, it was apparently prescribed as a preventive, and in any event, SH was "weaned" from it while still in Spain. The developmental delay noted in the infant in Spain is not described anywhere as the "severe" developmental delay that occurred in the United States. As noted above, plaintiffs are not suing over her esotropia, a condition her father lives with and does not seem to consider to be an injury to be sued over. Plaintiffs are suing over catastrophic neurological damage and cerebral palsy, which the government has not shown existed in SH while she was in Spain.

The government next asserts that Dr. Shales "told" the Holts, while they were still in Spain, that SH had cerebral palsy. *See* TR 793. The government is correct, and indeed, this evidence is uncontested. However, the evidence is not particularly probative of anything. Dr. Shales was the "developmental pediatrician" at Rota who examined and treated SH in Spain. TR 772–73. He was not a pediatric neurologist. TR 800. Indeed, there is nothing in the evidence adduced at trial that would allow this court to conclude that Dr. Shales was qualified to make such a diagnosis. The court cannot simply infer from his status as doctor, or as a developmental pediatrician, that he was qualified to make a proper evaluation of SH's neurologic system development, or to diagnose cerebral palsy. *See* TR 45 (Dr. Null expert testimony, cerebral palsy "has to do with the development of their neurologic system"); TR 296 (Dr. Griesemer expert testimony,

---

**20.** "Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace,* 549 U.S. at 391, 127 S.Ct. 1091.

pediatric neurology deals with cerebral palsy, among other brain, spinal cord, muscle and nerve issues).

In addition, although Dr. Shales told the Holts that Sarah had cerebral palsy, there is no evidence in the record to explain why he told them that.[21] Thus, the evidence does not show whether this statement reflects his own diagnosis (even if he were qualified to make it), or he was simply repeating what someone else told him, or whether he was telling them something he had read in a medical chart. Finally, even if Dr. Shales had been qualified to make this diagnosis, far more convincing evidence in the record shows that Dr. Shales's statement was incorrect, and that SH did not, in fact, have cerebral palsy at the time Dr. Shales said she did.

Dr. David Griesemer is a board certified doctor in pediatric neurology, is in charge of the pediatric neurology departments at two hospitals in North Carolina, treated SH in South Carolina, examined all the medical records relating to SH, and testified as an expert in this case. RT 294–95, 296–97. Dr. Griesemer discussed in some detail the examination that Dr. Shales had made, and concluded that "there was nothing on his exam that provided any evidence of cerebral palsy." RT 324–25. To the contrary, the medical records show that upon birth, SH "was doing well." RT 309. There was no evidence of "hypoxic ischemic injury or anoxic brain injury." RT 309. Moreover, looking at all the records that Dr. Shales had available to him, Dr. Griesemer concluded that "there is nothing in the medical record that allows him to draw that conclusion [that SH had cerebral palsy]." RT 329.

It appears that at least some of what Dr. Shales told the Holts came from an examination by Dr. Smith, a pediatric neurologist. However, Dr. Smith's report did not state that SH had cerebral palsy:

Q. BY MS. E. STEFFIN: Now, you had described Dr. Smith's examination of Sarah, and that was, again, Exhibit 2T, Defendant's Exhibit 2T, that we already looked at. What you're telling me then is it doesn't appear that there is a new exam here?

A. No. I think his [Dr. Shales's] current diagnosis, number one, basically parrots what Dr. Smith observed in her examination, you know, at six-and-a-half—I'm sorry—at 9 months of age. So, I mean, the words are exactly the same as in Dr. Smith's note.

Q. Except in Dr. Smith's note, did she make that diagnosis?

A. No, I'm sorry. The words hypotonia in the trunk and dynamic hypertonia in all extremities is taken directly from her note. The diagnosis of cerebral palsy was not in her note.

TR 328–29. Indeed, one of the "hallmark" or "cardinal" findings needed to establish the existence of cerebral palsy is "increased tone." TR 318. However, "that cardinal finding of cerebral palsy on Dr. Smith's examination was absent." TR 318. Other hallmarks of cerebral palsy—such as leg scissoring, adductor tightness, pathologically increased reflexes—were not present in Dr. Smith's report. RT 319–20.

As to the MRI that was taken in Spain, that also did not show the presence of cerebral palsy:

---

**21.** This deficiency arose because the government failed to comply with the rules that would have permitted him to testify as an expert, or to at least give expert testimony as a treating physician. *See* Fed.R.Civ.P. 26(a)(2)(C). Accordingly, Dr. Shales was able to testify only about communications he had with plaintiffs, and was precluded from testify about any underlying reasons, which would have required him to give expert testimony. *See Republic of Ecuador v. Mackay,* 742 F.3d 860, 865 n. 1 (9th Cir.2014).

THE COURT: Can I go back, Doctor. About to demonstrate how much I know. Given the finding, is that in your mind— do you have an opinion as to whether that is significant evidence of some sort of problem that the child is going to have or presently has?

THE WITNESS: No. I think everyone was very cautious not to equate this finding with something that would be necessarily problematic later. I think the best we get out of anyone, whether it's the radiologist or the neurologist, is this is something that needs to be followed up, we need to look at it later. It is clearly not a clear prediction of her later diagnosis of cerebral palsy.

TR 316–17.

Indeed, it is undisputed that cerebral palsy is a grouping of non-progressive, non-contagious motor conditions that cause physical disability in human development. Facts ¶ 117. Put another way, in general "cerebral palsy actually describes *symptoms* caused by some brain insult or injury." TR 66 (Dr. Null expert testimony) (emphasis added). Accordingly, this is not like a disease that might exist in the body but not be discovered, through outward symptoms, until some time later. In this case, the outward symptoms *are* the condition of cerebral palsy, so if they are not observable, or manifest, then the condition is not there:

THE COURT: ... If a child is not—in Sarah's case—is not exhibiting the classic symptoms of CP, is it fair to say—I know that defense counsel will ask this more carefully than I can—is it fair to say she doesn't have it, CP is not yet present, or it's simply disguised in some way? Is that a good question?

THE WITNESS [Dr. Griesemer]: Well, it's not disguised, but it's not manifest.

THE COURT: Okay. I understand now.

THE WITNESS: You know, when we talk about making a diagnosis of CP, it's got to be something that we can ascertain, that we can see, and it's got to be something that's a problem.

THE COURT: I got you.

THE WITNESS: And at this point it was neither. We couldn't see it, and it really wasn't a problem, and so everyone said, well, let's just keep her on our watch list.

TR 322.

The evidence shows that SH's cerebral palsy did not manifest itself until she was in South Carolina:

THE COURT: When was she first diagnosed with CP, Doctor, if you can tell me?

THE WITNESS: Neither of the pediatric neurologists in South Carolina, neither Dr. Barbosa nor Dr. Livingston, used the term cerebral palsy, but both of them suspected that she had spastic diplegia, and so that would be a type of cerebral palsy.

THE COURT: And that would be roughly at what age?

THE WITNESS: That would be at 16 to 17 months of age, which is about right. You know, it's creeping up on that 18–month period where a diagnosis is makeable.

TR 330–31 (Griesemer). Thus, the government's distinction between when a disease exists and when it is diagnosed is not so easily applicable to cerebral palsy, which is not a disease, but a group of symptoms or manifestations. The uncontested expert evidence of Dr. Griesemer shows that if those symptoms are not manifest, then the condition does not exist. In this case, there were symptoms that were consistent with premature birth, and with conditions that a premature child could grow out of. It was not until plaintiffs

arrived in South Carolina that symptoms appeared that doctors could identify as cerebral palsey.

The government next asserts that SH had "white matter brain damage" while in Spain. (ECF No. 174 at 14.) The question however, is whether there was any manifestation of that damage while plaintiffs were in Spain. The government identifies no evidence establishing that the issues the plaintiffs dealt with in Spain—leg shaking, developmental delay at 7 months and esotropia—are manifestations of "white matter brain damage," rather than ordinary, temporary manifestations of premature birth.

### D. Conclusion—Jurisdiction.

The court accordingly concludes that the government has not met its burden to show that the injuries plaintiffs are suing over occurred in Spain. To the contrary, the evidence shows that SH's cerebral palsy occurred in South Carolina. The government's motion to dismiss this case on the basis of the foreign claim exception will therefore be denied.

## II. THE MERITS

Plaintiffs are suing the United States for "medical malpractice" under the FTCA, the government's waiver of sovereign immunity for such claims. Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Liability is determined "in accordance with the law of the place where the [negligent] act or omission occurred." 28 U.S.C. § 1346(b). In this case, plaintiffs assert that the negligent acts and omissions occurred in the United States, namely, Dr. Stahlman's approval, at Edwards Air Force Base, of the Holts' application for overseas screening, without determining whether it was appropriate to give this approval given her then-current pregnancy, and her three prior problematic pregnancies.

■■■ Under California law, the elements of a claim for medical malpractice are

"(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."

*Gami v. Mullikin Medical Center,* 18 Cal. App.4th 870, 877, 22 Cal.Rptr.2d 819 (2nd Dist.1993) (quoting *Budd v. Nixen,* 6 Cal.3d 195, 200, 98 Cal.Rptr. 849, 491 P.2d 433 (1971)).

### A. Duty

■■■ The government argues that plaintiffs cannot establish the first element of their claim because Ms. Holt was not a patient of Dr. Stahlman, and therefore he did not owe her any duty. The government is correct that an "essential element" of plaintiffs' lawsuit is "the establishment of a duty owed to [Ms. Holt] by the physician." *Keene v. Wiggins,* 69 Cal.App.3d 308, 312, 138 Cal.Rptr. 3 (4th Dist.1977). The government next argues that the only way to establish this duty in a medical malpractice case is through the physician-patient privilege, citing *Keene.*[22] *Keene*

---

**22.** The government also asserts that plaintiffs "conceded" the point in their Trial Brief. ECF No. 174 at 15. The parties certainly can concede or stipulate to factual matters, and the court will generally respect such a conces- sion. The same is not true for concessions on the state of the law. The court always hopes that the parties' trial briefs and post-trial briefs will be helpful, but it is the court's job to rule on what the law is, not the parties.

expressly does not stand for this proposition when it comes to California law:

It is well established by authorities in *other states* the physician is liable for malpractice or negligence only where there is a relationship of physician-patient as a result of a contract, express or implied.

*Keene*, 69 Cal.App.3d at 313, 138 Cal.Rptr. 3 (emphasis added). *Keene* goes on to state:

In California, however, the courts have not used status alone as a means of determining liability.

*Keene*, 69 Cal.App.3d at 313, 138 Cal.Rptr. 3. Rather, under California law:

The fundamental principle is all persons are required to use ordinary care to prevent others being injured as a result of their conduct and any departure from this principle involves the balancing of a number of considerations, namely:

(a) the foreseeability of harm to the plaintiff;

(b) the degree of certainty the plaintiff suffered injury;

(c) the closeness of the connection between the defendant's conduct and the injury suffered;

(d) the moral blame attached to the defendant's conduct;

(e) the policy of preventing future harm;

(f) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and

(g) the availability, cost, and prevalence of insurance for the risk involved.

*Keene*, 69 Cal.App.3d at 312, 138 Cal.Rptr. 3 (citing *Rowland v. Christian*, 69 Cal.2d 108, 112, 70 Cal.Rptr. 97, 443 P.2d 561 (1968)). A final factor to be considered is

"the extent to which the transaction was intended to affect the plaintiff." *Keene*, 69 Cal.App.3d at 312, 138 Cal.Rptr. 3 (citing *Biakanja v. Irving*, 49 Cal.2d 647, 650, 320 P.2d 16 (1958)).

In *Keene*, the employer hired the doctor "solely to conduct an examination [of the plaintiff] for purposes of rating disability compensation benefits." *Keene*, 69 Cal. App.3d at 314, 138 Cal.Rptr. 3. The court expressly recognized that "[t]he person under examination is seeking benefits from the employer's carrier and is pursuing a claim *adverse to the interests of the employer.*" *Id.* (emphasis added). In applying the *Rowland* and *Biakanja* factors to the case before it, the *Keene* court found that the doctor did not "seek[ ] to provide a benefit" to the plaintiff, it was "not foreseeable a claimant in a workers' compensation case would, without question, accept and rely upon medical reports of the employer's insurance carrier." *Id.* Moreover, the examination "was solely for the carrier's benefit in the adversary workers' compensation proceedings," and there was no evidence that the doctor "voluntarily offered Keene any advice and counsel or otherwise intended to benefit Keene personally." *Id.*, at 316, 138 Cal.Rptr. 3. Accordingly, the court concluded that the doctor owed the plaintiff "no duty of professional skill in connection with the report" the doctor prepared for the plaintiff's employer. *Keene*, 69 Cal.App.3d at 316, 138 Cal.Rptr. 3.

This case is fundamentally different from *Keene*. According to the evidence adduced at trial, when an Air Force service-member is preparing to be transferred overseas, and he has dependents whom he would like to accompany him at government expense, the Air Force conducts an "overseas screening." [23] TR 497–

---

**23.** This assumes that the transferee location is one where dependents in general can go, that

98 (Copeland testimony). This screening was conducted by (1) a special needs coordinator, who had to have a degree in social work, or be a registered nurse, or the like, but was *not* an "administrative person," and (2) a "medical review officer," who had to be a physician or a physician's assistant under the supervision of a physician. TR 500:7–16.

The purpose of this screening was to "identify if there were any obvious contraindications to sending the family together as a unit." TR 501. Specifically, it was to identify whether the dependent has any special needs, and whether those needs can be met at the receiving location. TR 501–02. If a special need was identified, that would trigger two things. First, it would trigger a "Facilities Determination Inquiry." TR 502 & 503. Second, it would trigger an inquiry into whether the service member is already enrolled in the Exceptional Family Member Program, and if not, an evaluation for enrollment in that program would commence. *See* TR 503.

The overall purpose of this process, unsurprisingly, is "ultimately because of the military mission." TR 510. That is, if a service-member has dependents with special needs that are not being met at the overseas location, that will distract the service-member, and might even require the return of the family from the overseas location, all to the detriment of the military mission. RT 509 & 510. However, the means of ensuring that the military mission is not compromised in these situations, is to protect the "family member's well-being" while the service-member and the family are overseas. TR 509.

Viewing all this in the context of the *Rowland* factors, this court finds that Dr. Stahlman owed a duty to Ms. Holt to conduct the screening with the due care

expected of a physician. The harm to Ms. Holt was foreseeable, indeed avoiding such harm was the reason the screening was done in the first place—to avoid foreseeable harm to military depends going to live overseas. The very existence of this screening program is an acknowledgment that some Air Force bases are not medically appropriate for some dependents, and that sending them there would harm them, thereby harming the military mission.

Further, it is undisputed here that the plaintiff suffered an injury, and as discussed below, the evidence shows that it was proximately caused by Dr. Stahlman's conduct. The court finds that the policy of preventing future harm would be well served by ensuring that the medical screening process is not simply a "rubber-stamping" of the service-member's request to bring his family with him overseas. Moreover, the court is aware of no additional burden to the community by requiring that the doctor exercise due care in conducting the screening.

Finally, the court finds that the screening process was intended to benefit Ms. Holt. It is true that the ultimate goal of the screening was to benefit the Air Force, but that ultimate goal was to be achieved by ensuring the well-being of the service-member's family. Thus, in stark contrast to the *Keene* case, the physician here was not conducting a screening during an adversary proceeding with plaintiffs.

The government's citation to *Mero v. Sadoff,* 31 Cal.App.4th 1466, 1471, 37 Cal. Rptr.2d 769 (2d Dist.1995), is equally unavailing. That case held that a doctor *was* liable to a plaintiff for medical malpractice, despite the absence of a physician-patient relationship, where the doctor injured the patient during the course of a physical examination. The case confirms the prin-

is, excluding places like Afghanistan. TR 498:12–16.

ciple that the existence of a physician-patient relationship is not, in every case, required to find medical malpractice.

*Felton v. Schaeffer,* 229 Cal.App.3d 229, 234–35, 279 Cal.Rptr. 713 (4th Dist.1991), also relied upon by the government, does not compel a different result. Despite its broad language, *Felton* involved a physical examination that resulted in *economic* harm when the doctor negligently examined the plaintiff in the context of a pre-employment examination. In *Felton,* the doctor's negligence resulted in plaintiff not getting a job. Here, the alleged harm was medical, precisely the type of harm sought to be avoided by the medical screening.

The court concludes that Dr. Stahlman had a duty to screen Ms. Holt with the due care expected of a physician.

## B. Breach.

### 1. Undisputed Facts.

██ a. In or about 1998, Plaintiff Chantal Holt gave birth to her first child ("MH") while her husband was stationed at Travis Air Force Base, in Solano County, California. Facts ¶ 15.

b. Plaintiff Chantal Holt experienced preterm contractions and preterm labor with her first child. Facts ¶ 16.

c. Plaintiff Chantal Holt's first child was born at approximately 32 weeks. Facts ¶ 17.

d. In or about 2000, Plaintiff Chantal Holt gave birth to her second child ("LH") while her husband was stationed at a military installation in Germany. Facts ¶ 18.

e. Plaintiff Chantal Holt's second child was born at Landstuhl Medical Center, Germany. Facts ¶ 19.

f. Plaintiff Chantal Holt experienced preterm contractions and preterm labor with the second child. Facts ¶ 20.

g. Plaintiff Chantal Holt received care from Dr. Hildebrand, a specialist at Landstuhl Medical Center, while pregnant with her second child. Facts ¶ 21.

h. Plaintiff Chantal Holt's second child was born at approximately 34 weeks. Facts ¶ 22.

i. Plaintiff Chantal Holt's second child spent several days in the neonatal intensive care unit immediately after birth. Facts ¶ 23.

j. Plaintiff Chantal Holt's second child exhibited difficulties associated with prematurity, including difficulty breathing and eating, but suffered no long-term effects from the premature birth. Facts ¶ 24.

k. Prematurity is considered to be birth earlier than 37 weeks. Facts ¶ 26.

l. Having a history of premature births puts any subsequent pregnancy at a higher risk of premature birth. Facts ¶ 27.

m. Children born prematurely are at higher risk for neurological and other medical conditions, including cerebral palsy. Facts ¶ 28.

n. Plaintiff SH is the third child of Plaintiffs Ken and Chantal Holt. Facts ¶ 29.

o. On or before October 15, 2004, Plaintiff Ken Holt received notice that he would be transferred to the USAF Air Mobility Squadron at Rota Naval Station, in or around Cadiz, Spain. Facts ¶ 36.

p. In or about October 31, 2004, Chantal Holt contacted Nurse Practitioner Spikowski ("NP Spikowski") at Edwards AFB and told NP Spikowski that she had tested positive for pregnancy. Facts ¶ 37.

q. NP Spikowski advised Plaintiff Chantal Holt to stop taking certain medications at that time, and referred her for a pregnancy test. Facts ¶ 38.

r. Plaintiff Chantal Holt underwent a pregnancy test at the Edwards APB medical clinic. Facts ¶ 39.

s. The pregnancy test confirmed that Plaintiff Chantal Holt was pregnant on or about November 2, 2004. Facts ¶ 40.

t. NP Spikowski told Plaintiff Chantal Holt on or about November 2, 2004, that she should see Nurse Hobby to get a prescription for prenatal vitamins and to schedule a new pregnancy meeting. Facts ¶ 41.

u. At the new pregnancy meeting, Plaintiff Chantal Holt was given a list of civilian medical providers for her pregnancy care. Facts ¶ 42.

v. Plaintiff Chantal Holt chose Dr. Bansi Vora, a civilian doctor, for her pregnancy-related medical care. Facts ¶ 43.

w. In or about November 2004, Edwards APB medical staff gave plaintiff Chantal Holt a referral to Dr. Vora for her pregnancy-related medical care. Facts ¶ 44.

x. Dr. Vora is not an employee of the United States. Facts ¶ 45.

### 2. Findings of Fact

### a. Travis AFB and Landstuhl.

The uncontested evidence shows that after Ms. Holt's first pre-term delivery, the medical personnel at Travis did not "make a really big deal about it." TR 85. The child, MH, was placed in the NICU for 12 hours for monitoring, and plaintiffs were then sent home thinking they had had "the same experience everybody else had." TR 85.

The uncontested evidence also shows that prior to Ms. Holt's second preterm delivery, she was hospitalized twice at Landstuhl, and given IV drugs to prevent her preterm contractions. RT 87–88. After the premature birth of LH, the child was placed in the NICU for "[b]etween three and four" weeks. RT 89. Although this was Ms. Holt's second premature birth, the medical personnel at Landstuhl, including Dr. Hildebrand, did not give Ms. Holt any information or warnings about future births. TR 88–89; Facts ¶ 21. Instead, they told Ms. Holt her two premature births "don't appear to be related." RT 89.

The evidence further shows that because of Ms. Holt's two prior pre-term deliveries, "she was at very high risk to have a subsequent preterm delivery. And therefore, it was critical that she be informed of that risk factor." TR 33 (Dr. Null testimony).[24]

### b. Edwards AFB.

In late summer 2001, Mr. & Ms. Holt, MH and LH moved to Edwards Air Force Base in California. RT 89. During their time there, and before Ms. Holt became pregnant with SH, Ms. Holt had a miscarriage (sometimes referred to in the record as a "spontaneous abortion"). RT 646 (video deposition of Mr. Holt read at trial).

In October 2004, Mr. Holt was notified that he would be transferred to Spain for at least three years. TR 389–90. Mr. Holt accordingly completed a "RIP" form on which he listed his wife and two children, whom he wanted to accompany him on his overseas assignment.[25] RT 390–92 (Mr. Holt testimony); 499–500 (Copeland testimony). Mr. Holt and his family were

---

**24.** The government objected to this testimony as outside the scope of his expert report, but the objection was overruled. TR 33–35.

**25.** No witness could say what the acronym "RIP" stood for. However, Mr. Holt believes

it starts with "Record of Individual . . . ." TR 390. It appears to be "a . . . notification that you're being looked at for a specific assignment." TR 498 (Copeland testimony).

thereupon scheduled for an overseas screening session. RT 93 (Ms. Holt testimony).

Ms. Holt's pregnancy with SH was confirmed by Air Force medical personnel, on or about November 2, 2004.[26] The overseas screening session took place a few days later, on November 5, 2014. *See* TR 465–66 (Stahlman testimony); Tr. Exh. 48 (clearance for travel form). It was conducted by Dr. Stahlman and by Major Clark (now deceased). RT 465.

The purpose of the screening was to determine whether the dependents "had any medical problems that the gaining base would be unable to take care of." TR 450 (Stahlman testimony). In order to carry out this function, the doctor (and coordinator) spoke with the dependents and reviewed their medical records. TR 450. If during this process, the doctor identified any medical concerns, or anything he wasn't sure might be a medical concern, he would investigate further and "review the medical record more in depth." TR 451–52.[27]

One of the issues the doctor would look at, if he knew the patient was pregnant, was whether she "had any significant medical or OB problems." RT 453, 459 (would only investigate further if he knew the patient was pregnant). If there remains an issue as to whether the receiving base could handle a medical issue relevant to a dependent, then the doctor would request to have that information sent "to the gaining base so that they can review it." TR 453. That "review" would be to determine if the receiving base could handle the med-

ical issue. TR 42 (Null testimony). One such medical issue that would cause the doctor to get further information about the dependent is if he learned that the dependent had had two previous premature births and a prior miscarriage:

THE COURT: Right. But in your screening position, if you learned—actually, either from the records or from the conversation with the dependent that she had had previous premature—or two previous premature births, what would that tell you, if anything, in terms of your job, I mean?
THE WITNESS: We're just talking in generalities, correct?
THE COURT: Yes.
THE WITNESS: Correct. You would have to get further history of exactly what was going on with those pregnancies and exactly what kind of problems were going on, yes.
THE COURT: So at minimum, what would happen is if you learn that had there had been prematures, the next question you would have tried to ascertain was what was the nature and what was the problem?
THE WITNESS: Correct.

TR 454–55.

The uncontested evidence in this case is that at the time Dr. Stahlman conducted the overseas screening for the Holt family, Ms. Holt had already had two premature deliveries on U.S. military bases under the care of U.S. military medical personnel, as well as a miscarriage. The evidence shows that all of this information was documented in her medical records which were pro-

---

**26.** The undisputed facts and the testimony are unclear about whether November 2nd was the date of the pregnancy test, with the results coming later, or whether it was the date that the results were known.

**27.** The government now blames the late Major Clark for any deficiencies in the overseas screening. *See* ECF No. 147 at 17 & n. 8. Dr. Stahlman's own evidence shows, however, that he had a role—to investigate further—and that he (not Major Clark) failed to investigate further.

vided to, and reviewed by Dr. Stahlman prior to, or at the time of, the screening. *See* RT 467 (information from patient visits are placed directly into the patient's medical records). However, Dr. Stahlman did not do what he himself said he was required to do, and what Dr. Null said must be done under the standard of care, namely, investigate further, and determine whether the receiving base could handle a person with Ms. Holt's OB history. This conduct plainly did not meet the standard of care.

The government resists this conclusion by asserting that "there is no evidence that Col. Stahlman knew that Mrs. Holt was pregnant." ECF No. 147 at 17. The assertion is simply false, because there *is* evidence that Dr. Stahlman knew that Ms. Holt was pregnant. Even if the government believes the evidence is insufficient or should not be believed, it is simply false to assert that there is "no evidence" of it.

The evidence is uncontested that Ms. Holt's pregnancy test was done by Air Force medical personnel at Edwards Air Force Base. It is uncontested that this test result was entered into Ms. Holt's medical records kept by the Air Force. It is uncontested that Ms. Holt's medical records were provided to Dr. Stahlman, for his review, prior to the screening.

The government nevertheless asserts that Dr. Stahlman did not have access to the *laboratory* records showing Ms. Holt's pregnancy until after November 5th. ECF No. 174 at 17. That may be, but what happened to the official, paper laboratory results is not determinative of what Dr. Stahlman *knew*, or when he knew it. Even assuming that Dr. Stahlman did not see the records *from the laboratory* prior to the screening, the undisputed facts of this case establish that Carla Spikowski knew that plaintiff was pregnant on or about November 2, 2004, and told Ms.

Holt, on that date, "that she should see Nurse Hobby to get a prescription for prenatal vitamins and to schedule a new pregnancy meeting." Facts ¶ 41.

In order for Dr. Stahlman to know nothing of Ms. Holt's pregnancy, not only would the lab results need to still be in transit and not yet in the official records, but Spikowski must have failed to enter this obviously important medical development into Ms. Holt's medical records. Dr. Stahlman's own testimony refutes this possibility. He testified that when a person was seen in a clinic, the medical personnel would enter the notes from that visit into the medical records that day, even if the results of a lab test would not be entered until days later:

Q. ... Okay. And so do you know how often those records were updated, the paper charting that was done?

A. Well, normally, they would be pulled when a patient was seen in the clinic, and those notes from that visit would be put in the record.

Q. Do you know if that would take approximately 24 hours or more before a patient had been seen and the paper chart to make it to that individual's records?

A. Well, normally, if you saw a patient in the clinic, the papers from that visit would be put in the record that day.

THE COURT: Directly? You'd have the records there. You would put whatever you're—I don't mean you personally—the doctor would make whatever notes he made, and put it right in the record?

THE WITNESS: That's correct.

Q. BY MS. BERG: Was there a more lengthy process for lab results before they would make it into the actual paper records?

A. Right. So lab results would have to be sent from the lab to the central record area, and they might not be filed for a day or two, or several days. If the record had been pulled out of clinic for another visit, then it might take a little while for those two to match up.

RT 467–78. In other words, there is no reason to think that Dr. Stahlman only knew information contained in an official, paper laboratory report. Rather, he would also know what was entered into the medical record by Ms. Holt's other providers, including Spikowski. There is no basis for believing that Spikowski would have withheld this information, and the government does not assert that she did.

In any event, the evidence is contradictory on whether the official, paper lab report would have made it into the records reviewed by Dr. Stahlman in time. The government cites Dr. Stahlman's testimony that lab results "might not be filed for a day or two, or several days." *See* TR 468 (Stahlman testimony). But the government makes no reference to, nor does it attempt to refute the testimony of, Spikowski, who does not suffer the obvious bias that Dr. Stahlman does:

Question: And so if he—let me represent to you that he signed off on seeing her on November 5th. So is it fair to say that he would have had access to those medical records demonstrating she was pregnant on November 2nd?

Answer: That's a fair assumption.

RT 429–30 (videotaped deposition testimony of Spikowski).

In addition, the evidence shows that Dr. Stahlman was *told* in the screening room that Ms. Holt was pregnant, and that he discussed it with her. Ms. Holt testified as follows:

We got in there, and we sat down. [LH], as soon as we sat down, announced that he was going to be a big brother, which opened the conversation with the gentlemen.

They said that—the niceties that you get when someone announces that. And I told them that it was early on.

RT 94. Thus, Ms. Holt's direct, eye-witness testimony is that Dr. Stahlman was told of Ms. Holt's pregnancy, and discussed it with her.

This testimony is uncontested. Dr. Stahlman's testimony plainly showed that he did not specifically recall meeting Ms. Holt and her children for the screening. *See* TR 458–65. All of Dr. Stahlman's testimony regarding that screening were derived from the documents he was shown, and none of it came from his own memory. Finally, his testimony established that he did not remember, one way or the other, whether he discussed Ms. Holt's pregnancy with her:

Q. Okay. Do you have any recollection of whether or not you had a conversation with Mrs. Holt about pregnancies? And if you don't recollect, that's fine. I'm just asking.

A. I do not.

TR 465.

The government asserts that Dr. Stahlman "testified that he did not know that Mrs. Holt was pregnant." ECF No. 147. That is not a fair description of his testimony. After testifying that he did not recall having a conversation with Ms. Holt about her pregnancy, Dr. Stahlman then testified "I do not believe" that he saw the pregnancy lab reports, and "I do not believe that I knew that the patient was pregnant." TR 479 & 480. However neither of these statements even purports to come from his own memory. They are based upon the fact that Dr. Stahlman did not make a further investigation or request an FDI, and his belief that he would

have done so if he knew that Ms. Holt was pregnant.

The court finds that Dr. Stahlman knew that Ms. Holt was pregnant, and that Ms. Holt had had two prior premature deliveries and a miscarriage. The court further finds that Dr. Stahlman breached his professional duty of care to Ms. Holt by failing to investigate further her OB history, and failing to take any steps to ensure that her overseas travel would not endanger her or SH.

## C. Causation.

 Plaintiffs assert that the Air Force medical personnel's failure to warn Ms. Holt of the dangers inherent in future pregnancies, and its decision to let her travel to Spain without determining whether the facilities there were adequate to deal with her pregnancy, was the proximate cause of SH's injuries. They presented clear expert evidence to this effect:

BY MR. BERMAN: Now, Doctor, assume that they didn't approve her, assuming that she didn't go to Spain, all right, do you have an opinion as to whether or not she would have still delivered prematurely? . . .

MR. BRODERICK: Object. That's outside the scope.

THE COURT: Overruled. You may answer.

THE WITNESS: I think based on the two previous preterm deliveries where she did have early labor, or the appearance of early labor, and was managed appropriately by perinatal individuals, and didn't deliver extremely early, that I think there is very clear evidence that

she would not have delivered at the gestational age she delivered at.

. . .

THE COURT: And that is, in your view, a delayed delivery would have avoided, would most likely have avoided the consequences that Sarah now suffers?

MR. BRODERICK: And we'll respectfully object to the Court's question as outside the scope as well.

THE COURT: I understand that, and unfortunately—well—

THE WITNESS: The answer is, it absolutely would have avoided that, yes, sir.

TR 41–42 & 42–43 (Dr. Null expert testimony).

The government asserts that there is no causation because Ms. Holt received "appropriate" care in Spain. However, while there is no evidence that Ms. Holt was the victim of malpractice in Spain, the evidence is clear that Ms. Holt did not receive care in Spain that was appropriate for her dangerous pregnancy. Appropriate care for a person in her condition would be prenatal care addressing the danger, ready access to a NICU and specialists who deal with premature deliveries. *See* RT 64. None of this was available at the base where Ms. Holt got her care in Spain. *Id.* The government's assertion that appropriate care was available at a base in a nearby country (Germany), and at a private hospital in Spain that was not required to accept Ms. Holt,[28] does not address the fact that Ms. Holt was sent for care to an inappropriate facility.[29]

---

28. According to Ms. Holt's testimony, it took three hours for Rota personnel to find a hospital capable of handling a premature birth, and willing to accept her. RT 102. Moreover, this was taking place on the day she had the emergency C-section.

29. The same issue would arise if Ms. Holt had been sent to a facility that had only podiatrists available. Those doctors could well have practiced their craft perfectly, but it is not the care that plaintiff needed.

While there is no evidence (or allegation) that the care Ms. Holt received in Spain was negligent in any way, the evidence does show that the facility where she was treated was not capable of handling the issues she faced. It did not have a NICU and it did not have perinatal care available for Ms. Holt. TR 64 (Ms. Holt testimony). It had only one NICU nurse and none of the equipment that would be needed for a premature birth infant, such as proper-size intubation equipment or breathing tubes. TR 102. Overall, it was not equipped to prevent a premature birth or to handle a premature birth. TR 658–59.

As the direct result of these deficiencies, after Ms. Holt was already in preterm labor, she had to be rushed, by ambulance, to a facility capable of handling the situation. TR 658–59. Had appropriate specialists and facilities been in place at Rota, where Ms. Holt received her treatment, the traumatic, premature, emergency C-section that Ms. Holt and SH endured would "more likely than not" have been avoided. TR 42. Had that trauma been avoided, it is likely that SH's subsequent injuries would not have occurred, either. TR 42–43.

The court finds that the government's negligence in clearing Ms. Holt for travel to Rota, Spain, without making any effort to determine if the facility was adequate for her needs, was the proximate cause of the injuries that eventually befell SH.

## D. Damages.

### 1. Cost of care and lost earnings.

■ Plaintiffs offered the expert testimony of Jenny McNulty, an economic consultant, in support of its damages calculation. RT 356. She was subject to voir dire by the government, which established that her opinions were "premised on the reports of Dr. Barras and Dr. Ancell." TR 359. The government established that McNulty would not give opinions "as a life-care planner," and that she would not give "opinions as to life expectancy" or as to "vocational rehabilitation." TR 359–60. McNulty would testify only "in an economic capacity." RT 360. After its voir dire, the government announced that it was "fine with her testimony." TR 360.

McNulty accordingly calculated SH's "projected loss of earnings." TR 372. She relied upon U.S. Census Bureau data, and the Ancell expert report, assuming that without her injuries, SH would have earned an Associate's or Bachelor's degree, and would work for a typical number of years. TR 373–74. Her calculation for lost earnings came to $620,945, using the Associate's degree assumption, and $814,028, using the Bachelor's degree assumption. TR 373–74.

McNulty next calculated the value of Ms. Holt's time spent caring for SH. TR 374–76. She assumed that Ms. Holt cared for SH 24 hours a day, every day from the day SH came home from the NICU, excluding time SH spent in "the 4–K Head Start program," and excluding time SH spent in school. TR 375. McNulty used a valuation for Ms. Holt's time of $30 per hour, which is based upon the expert report of Dr. Barras.[30] RT 375. McNulty's calculation of Ms. Holt's time came to $1,860,497 through June 2013, or $2,014,000 through March 2014. TR 375–76.

30. The government asked McNulty how her calculations would be affected if the rate used were $18.50 per hour, instead of $30 per hour. TR 378. However, the government did not adduce evidence that the $18.50 rate was the correct rate to use. The only reference to that rate appears to be Ms. Holt's testimony that that rate would apply if she were to get "respite" care, but which she says she is not entitled to. TR 113.

McNulty next calculated the value of SH's future care expenses. RT 376–77. This calculation is based upon the expert report of Dr. Barras, which included costs for "surgeries to medical needs, seeing doctors, to also equipment, wheelchairs, et cetera, as well as nursing—the nursing attendant needs, and then also educational needs." RT 376–77. McNulty's calculation of these costs came to $7,023,383, if SH attended public school, and $7,384,072, if she went to private school.

The government did not challenge any of McNulty's testimony during its opportunity to cross-examine her and it did not object to her testimony after conducting a voir dire of her. After McNulty's testimony, the government moved to strike it, and in its post-trial brief, the government asserts that McNulty's testimony should be disregarded because the expert report of Dr. Barras, upon which her testimony was based, was not admitted into evidence, and because plaintiffs did not call Dr. Barras as a witness. It argues that "[o]pinions based on assumptions must be excluded if they lack a basis in the evidence." ECF No. 174 at 19, citing *Guidroz–Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 830–32 (9th Cir.2001), and *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir.1988). The government is correct in its general statement of the law, but that statement does not describe what occurred here.

McNulty based her testimony on expert reports, not the unsupported assumptions the Ninth Circuit rejected in *Guidroz–Brault*. Moreover, the government was in possession of the reports and cross-examined McNulty on those reports. As the court stated during the trial, McNulty, as an expert, can base her testimony on "any-thing she wants." *See* Fed.R.Evid. 703; *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir.1984) (expert can rely on inadmissible evidence, and it can even be admitted into evidence, although not for the truth of what is asserted there). If there was a problem with the expert reports that McNulty relied upon, the government had the opportunity to explore that in its cross-examination of McNulty. It did not do so.[31]

The government further asserts that any damages award must be reduced by the value of the care relating to the time the Holts were still in Spain. ECF No. 174 at 21. The government is correct on this point, as the Holts cannot claim damages for an injury in Spain that did not occur until after they left Spain. The calculation for past care will therefore be reduced by the cost of the care incurred during the 14 months the Holts were still in Spain, or $302,400.[32]

### 2. Emotional distress.

▮▮▮▮ Plaintiffs request damages for non-economic damages, pursuant to Cal. Civil Code § 3333.2. Pl. Tr. Br. (ECF No. 105) at 16. Such damages are limited to $250,000 for "pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage." Cal. Civil Code § 3333.2(a) & (b). At trial, plaintiffs established the physical impairment of SH, and therefore she is entitled to the statutory maximum. While there is no direct evidence of the pain and suffering experienced by the parents, common sense and common experience is evidence enough. Thus the court will award $250,000 for the parents' pain and suffering. Accordingly, non-economic damages

---

**31.** The government's motion to strike McNulty's testimony (ECF No. 146) accordingly will be denied.

**32.** $30 per hour × 24 hours per day × 30 days per month × 14 months = $302,400.

will be $250,000 for SH herself, and an additional $250,000 in total, for the parents' combined pain and suffering.[33]

### III. CONCLUSION

For the reasons stated above, the court finds and orders as follows:

1. The government's motion to strike the testimony of Jenny McNulty (ECF No. 146) is **DENIED**;

2. Plaintiffs' FTCA claim is not barred by the foreign claim exception of 28 U.S.C. § 2680(k);

3. Dr. Stahlman, a military doctor acting within the scope of his duties, breached his duty of care to Ms. Holt by clearing her for travel to Spain without investigating further her medical history of premature births and miscarriage, and without making any inquiry on whether the receiving base could handle her situation;

4. This negligence, and Ms. Holt's subsequent treatment at a base incapable of handling her situation, was the proximate cause of the injuries ultimately suffered by SH and her parents;

5. Plaintiffs suffered $10,409,700 in damages, as follows,

 a. $814,028 for SH's lost earnings; [34]

 b. $1,711,600 for Ms. Holt's costs of care; [35]

 c. $7,384,072 for SH's costs of future care; [36]

d. $250,000 for SH's non-economic damages; and

e. $250,000 for Mr. and Ms. Holt's pain and suffering.

IT IS SO ORDERED.

---

**33.** The government argues that Mr. Holt should not be awarded damages for emotional distress, citing the *Feres* doctrine. However, the negligent conduct here was the failure of Dr. Stahlman to conduct a proper inquiry into Ms. Holt's medical history, and his failure to ensure that the receiving base had facilities appropriate for Ms. Holt's care. Plaintiffs are not challenging the command decision to sponsor and pay for the travel of the service-member's family to Spain. Accordingly, the *Feres* doctrine does not apply here. *See McGowan v. Scoggins*, 890 F.2d

128, 135 (9th Cir.1989) (*Feres* precludes civil lawsuits over allegedly negligent command decisions).

**34.** This assumes that SH would achieve at least a Bachelor's degree.

**35.** This is $2,014,000 less $302,400, the cost of care in Spain.

**36.** This assumes that SH will need to attend private schools.