**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. EC-15-1186-JuFD |
| ) | |
| VILLAGE CONCEPTS, INC., ) | Bk. No. 12-30911 |
| ) | |
| Debtor. ) | Adv. No. 14-2054 |
| _____ ) | |
| ) | |
| DAVID D. FLEMMER, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[*] |
| ) | |
| MARK WEINER; NANCY WEINER; ) | |
| PARK VILLAGE CORPORATION, ) | |
| INC., ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on November 19, 2015
at Sacramento, California

Filed - December 4, 2015

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable David E. Russell, Bankruptcy Judge, Presiding[**]

_____

Appearances:    Jeremy Luke Hendrix of Desmond, Nolan, Livaich &
                Cunningham argued for appellant; Michael W.
                Thomas of Thomas & Associates argued for
                appellees.

_____

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[**] The Honorable Michael S. McManus was assigned to the underlying bankruptcy case and heard all pretrial matters in this adversary. Judge Russell entered the order on appeal.

-1-

Before:  JURY, FARIS, and DUNN, Bankruptcy Judges.

Chapter 7[1] trustee David D. Flemmer (Trustee) filed an adversary complaint against Mark and Nancy Weiner (collectively, Weiners or Shareholders), individually and in their capacities as trustees of The Kopp Family Revocable Living Trust (Trust), and Park Village Corporation, Inc. (Park Village).  The complaint sought to avoid pre-petition alleged fraudulent transfers made by the debtor, Village Concepts, Inc. (Debtor or VCI), to Park Village and the Trust under Cal. Civil Code §§ 3439.04 and 3439.05 and §§ 544 and 550.  After a trial, the bankruptcy court ruled against Trustee and this appeal followed. For the reasons discussed below, we AFFIRM.

## I.  FACTS

### A.  Debtor's Business

Debtor was in the business of selling new and used manufactured homes and managing mobile home parks.  Mark is Debtor's president and Nancy is Debtor's secretary.  The Trust is Debtor's sole shareholder, and the Weiners are the sole trustees and beneficiaries of the Trust.

In March 2009, Park Village was formed.  Its sole shareholder is the Trust.  Mark is the President and Chief Financial Officer of Park Village.

The Weiners or the Trust had an interest in at least nine mobile home parks, including Castle Village, LLC (CV LLC) and

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

-2-

Redding Riverside Village, LLC (RRV LLC) (collectively, CV LLC and RRV LLC are referred to as the Mobile Home Parks). CV LLC was a single asset California limited liability company used by Debtor to hold its 50% interest in a mobile home park located in Ione, California. RRV LLC was a single asset California limited liability company used by Debtor to hold its 70% interest in a mobile home park located in Redding, California. Debtor held 100% of the membership interests in CV LLC and RRV LLC.

**B.     The Construction Defect Litigation**

In 2005, Donald Harris (Harris) purchased a mobile home from Debtor and lived at Indian Village Estates. In early 2006, Harris complained about numerous defects with the mobile home. The community manager at Indian Village Estates wrote to Harris telling him to contact Mark directly due to the complexity of his issues. Harris and Mark then attended a mediation which was required under the sales agreement. On October 23, 2006, Harris and Debtor entered into a settlement agreement which required Debtor to make repairs.

On May 19, 2008, Debtor, along with Champion Home Builders Co., wrote a letter to the homeowners at Indian Village Estates which stated in part: "If you believe you have a claim that may be covered by your warranty, please submit it in writing to the dealer or manufacturer, and we will be happy to work with you to address your particular situation."

On October 22, 2008, Harris filed a state court complaint against Debtor alleging that it had breached the settlement agreement and that his mobile home was unsafe and in violation of the sale agreement.

-3-

On June 8, 2009, attorney Steven H. Haney (Haney) sent a demand letter to Mark and Debtor at 4101 Mother Load Dr., Shingle Springs, CA 95649.[2]  Haney advised Mark that his firm represented a number of owners of manufactured homes that had been purchased from Debtor who complained that the homes were defectively constructed.  Haney made a settlement demand for $1,250,000 which remained open until June 30, 2009.  Debtor did not respond to the demand letter and the letter was not returned to Haney.

On August 10, 2009, Haney filed a state court lawsuit against Debtor on behalf of his clients, asserting causes of action for breach of contract, construction defect, and breach of warranty.  This case was consolidated with the prior action filed by Harris.

On June 5, 2012, a trial in the state court commenced.  A jury was impaneled one week before Debtor filed its bankruptcy petition.

**C.   Debtor's Litigation With Former Employee**

Debtor was also involved in state court litigation with a former employee, Stanley Palesano (Palesano).  Palesano asserted whistleblowing claims against Debtor, contending that Debtor had tried to stop him from alerting the public to harmful and bad faith construction defect issues.  This case was dismissed in June 2009 when the parties agreed to walk away.

---

[2] Debtor's address was actually 4101 Mother Lode Dr. as opposed to 4101 Mother Load Dr.  At trial, Mark testified that Debtor received its mail at P.O. Box 736, Shingle Springs and that the Mother Lode address was a sales office and the place where Debtor stored its books and records.

**D.    The Prepetition Transfers**

On June 30, 2009, Debtor transferred its interest in the Mobile Home Parks to Park Village in return for 100% of the stock in Park Village.  As part of the same transaction, Debtor transferred its stock in Park Village to its sole shareholder, the Trust.[3]

To document these transactions, Debtor and the Shareholders entered into an Agreement and Plan of Corporate Separation and Reorganization dated June 30, 2009.  In Recital B, the Shareholders stated that they believed it was in Debtor's best interest to separate its current business into two corporations: a newly formed corporation, Park Village, would own and operate the Mobile Home Parks and Debtor would continue to own and operate the remaining business.  Recital D stated that Debtor intended to transfer all of its ownership interests in the Mobile Home Parks to Park Village in exchange for 100,000 of its shares.  Recital E stated that Debtor offered to transfer to Shareholders all of Park Village's shares in a transaction intended to quality as a tax-free spinoff under Internal Revenue Code (IRC) § 355 and that Shareholders desired to accept such offer pursuant to the terms set forth in the agreement.

The Plan of Reorganization also stated that the parties to the agreement intended to effect a tax-free reorganization under IRC §§ 361(A), 355, and 368(A)(1)(D) and that the purpose of the plan was to separate the operations, assets and liabilities of the business into two corporations with the same shareholders of

---

[3] Trustee blends these transfers together in his arguments.

-5-

each corporation.

Section 1.2 of the agreement stated:

> The CORPORATION shall transfer all of its ownership and membership interest and goodwill of the MOBILE HOME PARKS subject to all of the remaining liabilities, debts, obligations and contracts of the MOBILE HOME PARKS to the SUBSIDIARY in exchange for 100,000 shares of the SUBSIDIARY'S no-par common stock. The assets transferred to the SUBSIDIARY are shown on Exhibit 'D'. The transfer and assignment of assets shall be by transfer of membership interests in Castle Village, LLC and Redding Riverside Village, LLC in form and substance satisfactory to counsel for the CORPORATION and the SHAREHOLDERS, in each case with such other appropriate instruments of title as counsel for the SHAREHOLDERS may reasonably request.

Exhibit "D" to the agreement said: "One thousand membership units in Castle Village, LLC and Redding Riverside Village, LLC are to be transferred to Park Village Corporation."

Finally, the agreement stated that the closing would take place at 4101 Mother Lode Drive, Shingle Springs, California as of the end of business on June 30, 2009.

**E.    Bankruptcy Events**

On June 8, 2012, almost three years after the transfers and while the state court construction defect litigation was pending, Debtor filed a chapter 11 petition. The construction defect litigation plaintiffs (Creditors) filed proofs of claim in Debtor's case, asserting unsecured claims greater than $1.5 million.

The United States Trustee (UST) filed a motion to dismiss or convert the case because Debtor failed to timely file a plan and disclosure statement by the deadlines set by the court. On March 13, 2013, Debtor filed its chapter 11 plan and disclosure statement. Two days later, Creditors filed a motion to appoint

a chapter 11 trustee for the purpose of evaluating whether reorganization was feasible. Creditors alleged that there was strong circumstantial evidence that Mark had caused Debtor to make fraudulent transfers of its property to its sole shareholder, an affiliate entity also controlled by Mark, after he learned of their claims. They also alleged that they had no faith in Debtor's ability or willingness to fulfill its proper role as debtor-in-possession. Finally, Creditors complained that Debtor and its current management had nothing to lose by continuing to operate Debtor in self-dealing transactions.

The bankruptcy court conditionally denied the UST's motion to convert or dismiss. On April 24, 2013, the bankruptcy court granted Creditors' motion to appoint a chapter 11 trustee. On May 8, 2013, Flemmer was appointed as chapter 11 trustee.

About two months later, Trustee filed a motion to convert the case to chapter 7 on the grounds that (1) Debtor did not have sufficient current and prospective income to sustain operating expenses and professional fees necessary to a successful reorganization, and (2) the principal assets of Debtor consisted of litigation rights and equipment, both of which could be administered in a liquidation as effectively as in a reorganization. The bankruptcy court granted Trustee's motion and converted the case to chapter 7 by order entered on September 11, 2013. Flemmer was then appointed as the chapter 7 trustee.

**1.    The Adversary Complaint For Fraudulent Transfers**

On February 13, 2014, Trustee filed an adversary complaint against the Weiners and Park Village alleging that Debtor's

-7-

transfer of 100% of its interest in the Mobile Home Parks to Park Village in return for 100% of Park Village stock was fraudulent. Trustee also alleged that the issuance of new shares comprising 100% of the outstanding and issued stock in Park Village which were transferred to the Weiners in their capacities as trustees of the Trust was also fraudulent. Trustee maintained that these transfers were made with actual intent to hinder, delay, or defraud a creditor of Debtor under Cal. Civil Code § 3439.04 and §§ 544(b) and 550. Trustee also maintained that the transfers were constructively fraudulent because they were made without receiving reasonably equivalent value in exchange and that Debtor was insolvent at the time the transfers were made. Cal. Civil Code § 3439.05; §§ 544(b) and 550. Finally, Trustee sought turnover of the transferred property - Debtor's membership interests in the Mobile Home Parks - pursuant to § 542.

## 2. Declarations In Lieu Of Direct Testimony

Prior to trial, Debtor filed the declarations of Mark Weiner, Nancy Weiner, Michael Thomas Kutzman, and Burt Douglass[4] in lieu of direct testimony. Trustee filed the declarations of

---

[4] Douglass was Debtor's CPA. Trustee retained Douglass to prepare Debtor's tax returns after he was appointed. Debtor submitted Douglass' declaration in lieu of direct testimony on the issue of insolvency. Trustee opposed Douglass' declaration in part, contending that his testimony concerned specialized tax knowledge and Douglass had not been disclosed as an expert witness. At trial, Trustee's counsel elicited testimony from Douglass that Debtor's counsel argued was in the nature of expert testimony. After some discussion on the record, Trustee's counsel agreed that Douglass could be designated as an expert and the bankruptcy court designated him as such.

himself, Haney, and Barbara Lawson.[5]

**Mark Weiner:**  Mark testified that in early 2007, he sold a mobile home park in Southern California and realized a substantial gain.  As a result, Mark said that he was thinking of retiring and developing a plan to sell VCI to his children.  As part of that plan, Mark wanted to relieve VCI of indebtedness and encumbrances.  Therefore, according to Mark, he met with tax attorney and CPA Michael Kutzman in early 2008 to discuss a spinoff of VCI assets that would leave VCI in better financial condition in case his children decided to purchase the company.

Mark further testified that on July 1, 2004, VCI converted from a C Corporation to an S Corporation.  Consequently, the sale or transfer of any appreciated assets of VCI within a ten year period would result in a built in gains tax being levied against VCI as well as capital gains tax for the shareholders of VCI.  This was important as the Mobile Home Parks had a low basis at their acquisition because the parks were acquired as part of 1031 tax deferred exchanges.  Due to the built in gains issue, he contacted Kutzman, who proposed the creation of Park Village and an IRC §§ 350 and 358 spinoff of Park Village to the Trust.  According to Mark, this would allow the spinoff of the assets without incurring the built in gain and capital gains taxes.

Accordingly, on March 16, 2009, VCI formed Park Village to hold its membership interests in the two LLCs.  VCI was a 100%

---

[5] Because the testimony of Nancy Weiner and Trustee is mostly irrelevant to the issues raised in this appeal, a summary of their testimony is not included.

shareholder of Park Village. On June 30, 2009, VCI spun off its Park Village shares to the Trust.

Finally, Mark testified that at the time he began discussing the spinoff of the Park Village from VCI with Kutzman, he was not aware of any threatened or pending litigation against VCI by the Creditors represented by Haney.

**Michael Kutzman:** Kutzman, who was Debtor's attorney, testified that it was his understanding that Debtor wanted to reorganize so that it could focus on manufacturing and sales and split-off its mobile home park management business. Kutzman declared that he prepared and completed the IRC §§ 355 and 358 split-off of the mobile home park related assets and that he was "not aware of any other reason for the split off."

**Burt Douglass:** Douglass testified that pursuant to his retention, he reviewed certain documents including Debtor's financial records, bankruptcy statements, appraisals for the Mobile Home Parks, and other accounting records for 2008 through 2012. He also reviewed Debtor's balance sheet dated June 30, 2009, that was prepared by Mark. Douglass testified that based upon his preparation of tax returns for Debtor, and review of its accounting records, interviews of Kutzman and Mark Weiner, and review of its June 30, 2009 Balance Sheet, Debtor was not left insolvent as a result of the asset spinoffs and was not insolvent as of June 30, 2009. Douglass further opined that Debtor was in a better financial position after the spinoff and that the spinoff of the assets did not result in Debtor's

-10-

insolvency.[6] "Indeed, it appears that VCI continued to operate its business as a ongoing concern while paying its bills through early 2012." Finally, Douglass testified that his review of the matter showed that in 2004 Debtor converted from a C corporation to an S Corporation. As a consequence, under IRS rules, Debtor could not sell major assets for ten years without incurring significant built in gains taxes and capital gains taxes. However, IRC §§ 350 and 358 allowed for a spinoff of assets under some circumstances. In Douglass' view, it was normal in a spinoff to separate the companies and business types into individual units to operate more easily, to find funding more easily and to prepare for succession planning.

**Steven Haney:** Haney testified as to his representation of Creditors and the sending of the demand letter, which was addressed to Mark and Debtor. Haney testified that the demand letter was not returned.

**Barbara Lawson:** Barbara Lawson was Debtor's employee.[7] She was a sales representative and part-time manager at Indian Village Estates where Creditors lived. Lawson testified that she had told Mark about the complaints from residents who were threatening to sue Debtor due to construction problems with the manufactured homes. She also testified that in early 2006, Mark had instructed all sales staff, park management staff,

_____

[6] Although Douglass stated that he reviewed various documents, he did not offer an analysis as to how he reached his conclusion that Debtor was solvent as of June 30, 2009.

[7] In 2008, after litigation initiated by Lawson, Debtor obtained a judgment against her for $986.69. As a result, the bankruptcy court did not find her testimony credible.

construction management, and construction employees to stay away from Donald Harris and others because they were threatening to sue him. Finally, Lawson declared that in January or February 2007, she reported to Mark that some of the residents had met with an attorney with respect to the construction defect issues related to the manufactured homes and that they were planning to sue.

### 3. The Trial

On April 27, 2015, the bankruptcy court held a trial. There was extensive cross examination of Douglass and Mark. At the close of trial, based upon its review of the evidence and testimony, the bankruptcy court made several findings of fact on the insolvency issue. First, the bankruptcy court stated that in its mind, the June 30, 2009, balance sheet prepared by Mark "wasn't a balance sheet," but looked like a trial balance that "somebody had worked up."[8] Next, the court said that it had heard from the accountant (Burt Douglass) that Debtor was solvent and that it believed the accountant's testimony. Third,

---

[8] The balance sheet contained three columns. The first column showed book value of the assets and liabilities and capital. The second column purported to show market value for the transfers and the third column showed market value as of July 1, 2009, the day after the transfers. The middle column shows that total assets were $11,268,641.65 (although only the transferred assets were at market value, the others remaining at book value) and total liabilities were $11,320,490.90 as of June 30, 2009. Accordingly, the liabilities appeared to exceed the assets by approximately $51,000. The balance sheet also shows that immediately after the transfer on July 1, 2009, the total assets were $6,616,652.87 and total liabilities were $5,992,148.78 and thus the net capital available after the transfer was $624,504.09.

the court noted that the 2009 calendar year tax return showed that Debtor was solvent on Schedule L: "It shows that the corporation is solvent. Sure, they had sustained losses but the assets exceeded the liabilities."[9] Finally, the court observed that although Debtor did not make money between 2009 and 2012, the Debtor was still solvent: "They stayed in business. They paid their bills for three years after the 2009 transfer." In the end, the bankruptcy court concluded that Debtor was solvent both before and after the transfer.

Disagreeing with Trustee, the court also implicitly found that Debtor received value in exchange for the transfer. The court found that "[t]here was tremendous value. There was substantial reduction of debt." The court also found that although there was no written agreement for the assumption of debt, there could be an oral agreement: "[A]nd oral agreements are just as enforceable as written agreements and if the parties agreed that the debt was resolved, it's resolved."

In considering Debtor's actual fraudulent intent, the bankruptcy court acknowledged that the transaction was between insiders and that they retained control of the assets both before and after the transfers. But the court stated that it was not convinced that Debtor's knowledge of the construction defect litigation showed actual fraud as to the transfer. The

[9] Schedule L "Balance Sheets per Books" showed that at the end of the 2009 calendar tax year, Debtor's total assets and liabilities were $4,757,072. Douglass testified at trial that after adding up the numbers and backing out the value of the capital stock and retained earnings, the liabilities would actually be $4,924,574. Therefore, at the end of 2009, Debtor's liabilities would be greater than its assets at book value.

-13-

court opined that these types of suits were part of doing business: "If you do business and you sell mobile homes, you will have people complain about the type of mobile homes you had." According to the court, if you are in business "you're always going to be threatened with lawsuits. That doesn't mean very much." The court also believed Mark's testimony that he did not know about Haney's demand letter and the threatened lawsuit, noting too that there was no lawsuit actually filed and "it was only a threat."

Finally, the bankruptcy court said that it believed Mark's testimony as set forth in his declaration; i.e., that the transfer was made to accomplish a tax spinoff. Mark testified that he contacted his attorney to make the transfer in early 2008, long before any threats by Haney were made, and that he was following up on a family plan. According to the court, the transaction did not take place until 2009 because it was a complicated transaction to get done. In the court's view, that Haney's letter said they had to settle by June 30, 2009, the same date the transfer took place, "was just a coincidence." In the end, the bankruptcy court concluded that Trustee failed to show actual fraudulent intent just because of the threatened litigation.

The bankruptcy court entered the judgment against Trustee on May 26, 2015. Trustee filed a timely notice of appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

-14-

## III.  ISSUES

Did the bankruptcy court err in finding that Trustee did not meet his burden of proof on the issue of insolvency?

Did the bankruptcy court err in finding that Debtor did not make the transfers with actual fraudulent intent under a "badges of fraud" analysis?

## IV.  STANDARDS OF REVIEW

We review findings of fact for clear error and conclusions of law and mixed questions of law and fact de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

The bankruptcy court's determinations about insolvency resolve questions of fact which are reviewed for clear error. In re Weinberg, 410 B.R. at 27-28.

Whether there is actual intent to hinder, delay, or defraud creditors is also a question of fact. Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 235 (9th Cir. BAP 2007) (citing Bulmash v. Davis, 24 Cal.3d 691 (1979); Filip v. Bucurenciu, 129 Cal. App. 4th 825 (2005); Annod Corp. v. Hamilton & Samuels, 100 Cal. App. 4th 1286 (2002)).

A bankruptcy court's factual determination is clearly erroneous if it is illogical, implausible, or lacks support in inferences that may be drawn from facts in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009) (en banc) (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. at 564, 577 (1985)) (explaining that the clearly erroneous standard of review is an element of the clarified abuse of discretion standard).

Where there is admitted evidence in the record to support

the bankruptcy court's fact findings, an appellate court cannot substitute its views of the facts for those of the bankruptcy court. Anderson, 470 U.S. at 573. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574. Moreover, findings based on determinations about the credibility of witnesses "demand[] even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575.

## V. DISCUSSION

Section 544(b) confers on bankruptcy trustees the power to avoid any transfer of an interest of the debtor in property that is voidable under nonbankruptcy law by a creditor holding an allowable unsecured claim. Here, the "nonbankruptcy law" is California's Uniform Fraudulent Transfer Act (CUFTA). "Whether a transfer is avoidable under the [CUFTA] is a question purely of California law as to which the California Supreme Court is the final authority. Thus, a federal court construing the CUFTA is merely predicting what the state supreme court would rule if presented with the question." In re Beverly, 374 B.R. at 232.

**A. Constructive Fraudulent Transfer: The Trustee did not meet his burden of proof regarding insolvency.**

Under Cal. Civil Code § 3439.05, a transfer is constructively fraudulent if the debtor made the transfer without receiving reasonably equivalent value in exchange and the debtor was insolvent at that time or rendered insolvent as a

-16-

result of the transfer. Trustee must prove both reasonably equivalent value and insolvency by a preponderance of evidence.[10] In re GSM Wireless, Inc., 2013 WL 4017123, at *17 (Bankr. C.D. Cal. April 5, 2013) (citing Whitehouse v. Six Corp., 40 Cal. App. 4th 527, 533–34 (1995)).

### 1. Insolvency

Cal. Civil Code § 3439.02(a) provides that "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." This is the balance sheet test for insolvency. Bay Plastics, Inc. v. BT Comm. Corp. (In re Bay Plastics, Inc.), 187 B.R. 315, 328 n.22 (Bankr. C.D. Cal. 1995). Under Cal. Civil Code § 3439.02(c), "[a] debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." This is the cash flow test for insolvency. In re Bay Plastics, 187 B.R. at 328 n.22.

As a general rule, solvency and not insolvency is presumed. Neumeyer v. Crown Funding Corp., 56 Cal. App. 3d 178, 186 (1976). "To overcome the presumption of solvency, there must be some basis in evidence for determining that the amount of the debtor's obligations exceeded the then present fair salable value of his nonexempt assets." Id. Here, because a statutory

---

[10] "The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993). The preponderance of the evidence standard "'allows both parties to share the risk of error in roughly equal fashion.'" Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983).

-17-

presumption of insolvency did not apply, Trustee was required to introduce evidence which by a preponderance proved Debtor's insolvency at the time of the transfer. He did not.

At the outset, we disagree with Trustee's contention on appeal that the bankruptcy court applied the "wrong" test for insolvency under California law. As noted above, there are two alternative tests to establish a debtor's insolvency under Cal. Civil Code 3439.02 - the balance sheet test and the cash flow test. The bankruptcy court found that Trustee had not proved insolvency under either test.

As to the cash flow test, the court found: "And certainly, the corporation satisfied the second [test], didn't it? They continued in business and they paid their bills." In addressing the balance sheet test, the court stated: "I looked at the statements that were provided, I have heard the testimony of the parties, as far as I am concerned, the corporation was also solvent, if you look at the liabilities and assets." Since the bankruptcy court considered both the balance sheet and cash flow test, we review its factual findings on insolvency under the clearly erroneous standard.

### a. The June 30, 2009 Balance Sheet

To determine whether Debtor was solvent or insolvent on June 30, 2009, the bankruptcy court considers the "fair valuations" of the assets owned by Debtor and the amount of debt that it owed. Cal. Civil Code § 3439.02(a). "This differs from a balance sheet, where most assets apart from publicly traded stocks and bonds are carried at historic cost, rather than current market value." In re Bay Plastics, 187 B.R. at 330.

-18-

The resolution of the insolvency issue called for some relevant and reliable information concerning the "fair valuation" of the assets and outstanding liabilities on the critical date. Here, there was none.

Trustee argues that the June 30, 2009 balance sheet prepared by Mark conclusively proves that Debtor was insolvent at the time of the transfer. In other words, Trustee relies on the values set forth in the balance sheet to establish Debtor's insolvency at the time of the transfer. Trustee accurately points out that the balance sheet shows liabilities of $11,320,490.90 and assets of $11,268,641.65. Thus, according to these figures, Debtor was insolvent by at least $51,849.25 on the date of the transfer. Trustee also asserts that at his deposition, Mark testified that Debtor was insolvent on the date of the transfer. Mark testified: "The assets were - before the transfer was $11,268,641, and the total liabilities was $11,320,000, so they were upside-down roughly $52,000." Trustee's counsel then asked: "So on the date of the transfer, its liabilities exceeded its assets by about $52,000?" Mark answered: "Yes, but because of the transfer, their assets increased to $524,000 and that doesn't include consideration for the assumption of the lawsuit, the assumption of the built-in gain risk." Essentially then, according to Trustee, Mark admitted that Debtor was insolvent on the date of the transfer. On these bases, Trustee asserts that he met his burden of proving insolvency. We disagree.

As discussed below, the bankruptcy court correctly concluded that the balance sheet was not sufficient to establish

Debtor's insolvency on June 30, 2009. First, Mark prepared the balance sheet and he is not a financial expert. There is nothing in the record that shows Mark was qualified to proffer an opinion as to the true value of Debtor's assets or liabilities on June 30, 2009. Even if he was, Mark did not testify as to what valuation method was used in calculating the "fair" value of the assets and liabilities placed on the balance sheet. Nor did Douglass. Moreover, the only market values shown on the balance sheet were those of the transferred assets. The document is clear that only book value is used for any other asset.

In addition, the bankruptcy court expressly did not find the balance sheet reliable because, in the court's view, it was more of a trial balance than a balance sheet.[11] Without the aid

---

[11] Generally, a trial balance is an internal report that will remain in the accounting department. It is a listing of all of the accounts in the general ledger and their balances. However, the debit balances are entered in one column and the credit balances are entered in another column. Each column is then summed to prove that the total of the debit balances is equal to the total of the credit balances. In contrast, a balance sheet is one of the financial statements that will be distributed outside of the accounting department and is often distributed outside of the company. The balance sheet is organized into sections or classifications such as current assets, long-term investments, property, plant and equipment, other assets, current liabilities, long-term liabilities, and stockholders' equity. Only the asset, liability, and stockholders' equity account balances from the general ledger or from the trial balance are then presented in the appropriate section of the balance sheet. Totals are also provided for each section to assist the reader of the balance sheet. The balance sheet is also referred to as the statement of financial position or the statement of financial condition. Harold Averkamp, What is the difference between a trial balance and a balance sheet?,

(continued...)

-20-

of Trustee's own expert as to what the proper assumptions were underlying the numbers, the bankruptcy court had no persuasive evidence before it as to the fair market values of Debtor's assets and liabilities.

Second, Douglass' trial testimony raised doubts about the accuracy of the balance sheet. He testified that Debtor's assets would exceed its liabilities on June 30, 2009, if the shareholder loans were removed from the liabilities portion of the balance sheet. Although Douglass acknowledged that shareholder loans were a liability that should be included in the balance sheet, that statement was qualified: "If there is a promissory note, then it should be included in the liability section of the balance sheet." Douglass also testified that he did not know if there were any promissory notes associated with the shareholder loans. Accordingly, Douglass did not know whether they should be included in the liabilities or not.[12] Trustee offered no evidence to refute any of this testimony.

Third, Mark's trial testimony also raised questions about the accuracy of the balance sheet that he had prepared. Mark testified at trial that Debtor was "not insolvent."

    Q. So different than what your deposition testimony
    was?

    A. I don't believe I used the word insolvent. I said
    the balance sheet showed a minus $52,000 on that
    middle column, but there is a bunch of things that

[11](...continued)
Accounting Coach, www.accountingcoach.com.

[12] Douglass' testimony implied that if there was no evidence of debt - i.e., a promissory note - shareholder "loans" would instead be capital contributions.

-21-

weren't included in that.

Finally, Trustee complains that notably absent from the balance sheet was any accounting for the potential liabilities related to the construction defect claims against Debtor. According to Trustee, this was error because disputed or contingent liabilities must be included in calculating total indebtedness for purposes of determining insolvency, citing Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.), 96 B.R. 275, 279 (9th Cir. BAP 1989). There, the Panel indicated that disputed or contingent liabilities must be included in determining total indebtedness for purposes of an insolvency analysis under § 547. The Panel also noted that contingent debts must be reduced to reflect their present or expected amount.

Although contingent liabilities are included in determining total indebtedness for purposes of deciding insolvency, the bankruptcy court's failure to include them here was not clearly erroneous. The evidence shows that Debtor had no contingent liabilities as of June 30, 2009, or if it did, they were indefinite, speculative, and not material. Mark testified that he did not receive Haney's demand letter and, as the bankruptcy court noted, even if he had received the letter, it simply threatened a lawsuit. Mark also testified that he thought the matter with Harris was settled and that he was unaware of any further litigation. Finally, Mark testified that as of June 29, 2009, he was not aware of any construction defect claims that would pose a financial hardship to Debtor. In other words, even if the construction defect litigation claims were pursued,

-22-

according to Mark, the anticipated magnitude of those claims was not great.[13]  The bankruptcy court found Mark's testimony credible.

> When factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note 'variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'

Anderson, 470 U.S. at 575.  We thus defer to the bankruptcy court's reasonable assessment of Mark's credibility.

In addition, even assuming such contingent liabilities existed, Trustee provided no evidence that attempted to quantify the amount of Debtor's likely liability on the construction defect claims.  Therefore, the bankruptcy court had no evidence from Trustee showing that the construction defect litigation would have rendered Debtor insolvent.  For all these reasons, the bankruptcy court did not clearly err by failing to include contingent liabilities in its insolvency analysis.

In the end, given the uncertainties upon which the values in the balance sheet were based, the bankruptcy court could reasonably infer that it did not show by a preponderance of the evidence that Debtor was insolvent on June 30, 2009.  Trustee's reliance on the balance sheet as conclusive evidence of insolvency was misplaced.

### b.    The 2009 Calendar Year Tax Return

Next, Trustee points to Debtor's 2009 calendar year tax

---

[13] For example, if fifteen others had claims similar to Harris' claims, each being worth $2,000 in settlement, Debtor's exposure would be no more than $30,000.

-23-

return as conclusive evidence of Debtor's insolvency. Trustee argues that Douglas testified at trial that the liabilities shown on Schedule L of the return were reported incorrectly as $4,757,072, and that they should have been reported as $4,924,572, which exceeds Debtor's reported assets by $167,502. Trustee also contends that based on Debtor's consistent and substantial losses from 2008 through 2010, the accompanying negative retained earnings, and the reported liabilities in excess of assets on the 2009 tax return, "it is implausible that Debtor was solvent on June 30, 2009." Finally, Trustee maintains that the court clearly erred in first believing that the 2009 tax return reported assets in excess of liabilities and then dismissing the mistake and focusing on the Debtor's continuing business operations after the transfer. We are not persuaded.

Although Douglass did testify that the liabilities on Schedule L were added up incorrectly, Schedule L on the tax return is irrelevant to the question of whether Debtor was insolvent at the time it made the transfer for several reasons. Douglass testified that in preparing Schedule L, his intent was not to show insolvency but to report income and expenses. Douglass also testified that the value assigned to the assets in Schedule L did not reflect fair market values because the tax return "typically reflects cost basis from the financial statements. So whatever you see here was what the taxpayer originally paid for the asset." Clearly then, Douglass' preparation of the tax return had different goals than that of an insolvency analysis. On this basis, the bankruptcy court

-24-

could reasonably conclude that Schedule L was not probative to the question of whether Debtor was insolvent on the date of the transfer.

Debtor's history of operating losses is also cited by Trustee as evidence of insolvency. However, the bankruptcy court correctly concluded that no useful inferences could be drawn from those losses. The fact that Debtor operated at a loss for a period of time is not an indication of the potential value of the company.

### c. Presumption of Solvency

Mark testified that after the June 30, 2009 transfer, Debtor continued its operations and paid its debts. Because Debtor continued to operate and pay its bills for almost three years after the transfer, an inference of insolvency under Cal. Civil Code § 3439.02(c) was not warranted. Therefore, it was Trustee's burden, not the defendants', to prove insolvency by a preponderance of the evidence.[14]

---

[14] At trial, the bankruptcy court designated Douglass as an expert witness. Generally, Fed. R. Evid. 702 "requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." Guidroz-Brault v. Missouri Pac. R. Co., 254 F.3d 825, 829 (9th Cir. 2001). In applying Fed. R. Evid. 702, the trial judge must act as a gatekeeper to ensure that the expert's testimony "rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

Here, Douglass opined in his declaration in lieu of direct testimony that Debtor was solvent and generally paying its debts as they became due. The bankruptcy court found Douglass' testimony credible. However, the record does not show whether Douglass' conclusion of solvency was based on tested assumptions about the accuracy of values that had been placed internally on

(continued...)

-25-

The record shows that Trustee failed to satisfy that burden or overcome the presumption of solvency as there was no reliable evidence from which the court could reasonably infer that the amount of Debtor's obligations exceeded the then present fair salable value of its assets. Trustee did not offer evidence to refute any of the testimony given by Douglass or Mark on the issue of insolvency. Accordingly, based upon the preponderance of the evidence presented, the bankruptcy court's ruling against Trustee on the insolvency issue was not clearly erroneous.

## 2. Reasonably Equivalent Value

To make out a successful fraudulent transfer claim under Cal. Civil Code § 3439.05, Trustee must show not only that Debtor was insolvent at the time of the transfer, but also that it failed to receive "a reasonably equivalent value in exchange for the transfer." The Trustee having failed to prove insolvency, a necessary element for a constructive fraudulent transfer, it is unnecessary for us to reach this issue.

## B. Actual Fraudulent Transfer: The Trustee did not meet his burden of proof regarding actual intent.

Under the CUFTA, a transfer is intentionally fraudulent if it is made with the intent to defeat, hinder or delay creditors. Cal. Civil Code § 3439.04(a)(1) provides that transfers made with actual intent to delay, hinder, or defraud creditors are fraudulent and therefore voidable. Since direct evidence of

[14](...continued)
Debtor's assets or liabilities. Nonetheless, to the extent the bankruptcy court erred in relying on Douglass' testimony, the error was harmless because the record shows that Trustee did not meet his burden of proof on insolvency.

intent to hinder, delay or defraud is seldom available, the determination typically is made inferentially from circumstances consistent with the requisite intent. In re Beverly, 374 B.R. at 235 (citing Filip, 28 Cal. Rptr. 3d at 890).

The use of the "badges of fraud" to find intent is well-established. Cal. Civil Code § 3439.04(b) sets out eleven non-exclusive examples of events, acts, or statuses that may help determine whether such actual fraud exists: (1) whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;[15] (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a

_____

[15] "Insolvency is but one of numerous factors a court has discretion to consider in determining whether a party acted with actual intent to defraud." Garcia v. Palmer, 2013 WL 6147111, at *4 (Cal. Ct. App. Nov. 22, 2013). Proving insolvency is not a requirement.

lienholder who transferred the assets to an insider of the debtor.

Here, the bankruptcy court agreed with Trustee that some badges of fraud were present: the transfers were made by insiders and those insiders maintained control both before and after the transfers. On appeal, Trustee argues that other badges of fraud were present and, therefore, actual fraud was proven.

Trustee's main focus is that Debtor had been sued and threatened with suit prior to the transfer. According to Trustee, while Mark testified that he did not receive Haney's demand letter, both Mark and Nancy acknowledged at trial that the letter was addressed to a location used by Debtor to store its property and records and the transfer agreement identifies the location as the place for closing the transfer. Trustee maintains that the mailbox rule creates a rebuttable presumption that documents duly served by mail have been received by the addressee at the address stated in the proof of service under Faden v. Segal (In re Segal), 2015 WL 400643, at *7 (9th Cir. BAP Jan. 29, 2015). Trustee also argues that to overcome the mailbox rule presumption, the party served ordinarily must present something more than a bald denial of receipt and here defendants did not produce anything other than a denial of receipt. Finally, Trustee points out that he offered rebuttal witness testimony from Adam Weiner that showed he was the attorney of record for Debtor and spoke to Haney about the demand letter.

In essence, Trustee attempts to reweigh the evidence in his

favor to suggest another outcome for this badge of fraud. However, our role in this appeal is not to reweigh the evidence presented to the bankruptcy court. Anderson, 470 U.S. at 575. Putting the receipt of the letter aside, the bankruptcy court stated that it was not convinced that the construction defect litigation showed actual fraud for another reason. The court opined that these types of suits were part of doing business: "If you do business and you sell mobile homes, you will have people complain about the type of mobile homes you had." According to the court, if you are in business "you're always going to be threatened with lawsuits. That doesn't mean very much." Accordingly, in the court's view, Mark's receipt of the demand letter was not dispositive evidence of actual fraud.

Trustee also argues that the transfer involved substantially all of Debtor's assets. However, at trial, Mark testified that Debtor did not lose all or substantially all of its assets in the transfer. After the transfer, there were assets remaining: "All the inventory items which consisted of mobile homes and RV's and equipment, a lot of construction equipment, and substantial notes receivable." This testimony was not rebutted by Trustee at trial. Moreover, the balance sheet identified many assets which were not transferred representing more than half of the total book value of the assets.

Finally, as noted above, although Trustee had not proved Debtor was insolvent on the date of the transfer, proof of actual fraud does not require proof of insolvency. Likewise, even if Trustee had proved Debtor did not receive reasonably

equivalent value in exchange for the transfer, an issue which we need not reach, this still would not necessarily add up to actual fraud.  As we previously observed:

> The [C]UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula.  No minimum number of factors tips the scales toward actual intent.  A trier of fact is entitled to find actual intent based on the evidence in the case, even if no 'badges of fraud' are present.  Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'

In re Beverly, 374 B.R. at 236 (citing Filip, 28 Cal. Rptr. 3d at 890); Annod Corp., 123 Cal. Rptr. 2d at 932-33 (court "should evaluate all of the relevant circumstances involving a challenged transfer" and "may appropriately take into account all indicia negativing as well as those suggesting fraud. . . ."); see also Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994) (discussing actual fraud under § 548(a)(1): "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.").

In short, many of the typical elements associated with an actual fraudulent transfer are not present in this case.  The bankruptcy court considered Mark's explanation for the transfer as a tax spinoff credible.  This was sufficient, in the bankruptcy court's mind, to rebut the circumstantial inference of actual intent arising from the few badges of fraud that were present.  Accordingly, the bankruptcy court's factual finding that Debtor had not made the transfer with actual fraudulent

-30-

intent was not clearly erroneous.

## VI. CONCLUSION

Having found no error, we AFFIRM.